MEMORANDUM AND ORDER
 

 MILLER, District Judge.
 

 Margaret Clark and Dana Clinton filed claims of race discrimination in connection with the termination of their employment as licensed practical nurses (LPNs) from the Michigan City Health Care Center (MCHCC), a nursing home facility that defendants MetroHealth Foundation, Inc., MetroHealth Foundation/Midwest, Inc., and ServiceMaster Diversified Health Services L.P. owned and operated. After an eight-day trial, Ms. Clark and Ms. Clinton won jury verdicts. The jury awarded Ms. Clark $20,000 in back pay and benefits, $150,000 in compensatory damages, and $150,000 in punitive damages. The jury awarded Ms. Clinton $14,783.05 in back pay and benefits, $100,000 in compensatory damages, and $150,000 in punitive damages. Pursuant to Rule 59 of the Federal Rules of Civil Procedure, the defendants moved for a new trial with regard to damages or alternatively to alter the jury’s verdict by reducing the damages awarded. The defendants also objected Ms. Clark’s and Ms. Clinton’s fee petition. In addition, Ms. Clark and Ms. Clinton seek awards of front pay in lieu of reinstatement to employment at the Michigan City
 
 *979
 
 Health Care Center and other equitable relief.
 

 1. Motion for New Trial or Alter Judgment
 

 When presented with a motion for a new trial, the court may grant a new trial where “the verdict is against the clear weight of the evidence, the damages are excessive or the trial was unfair to the moving party.”
 
 Miksis v. Howard,
 
 106 F.3d 754, 757 (7th Cir.1997). When the request is based primarily on the damages’ excessiveness, of the damages, the court may “vacate the jury’s verdict if the award is either ‘monstrously excessive,’ ‘shocks the judicial conscience,’ has ‘no rational connection to the evidence,’ or clearly appears ‘to be the result of passion and prejudice.’ ”
 
 Fall v. Indiana Univ. Bd. of Trustees,
 
 33 F.Supp.2d 729, 744 (N.D.Ind. 1998) (citations omitted). A court must review damages evidence in the light most favorable to the jury’s verdict, and the verdict must stand unless there is no rational connection between the evidence and the jury’s award.
 
 See McNabola v. Chicago Transit Authority,
 
 10 F.3d 501, 516 (7th Cir.1993).
 

 The standard for reducing a jury’s award of damages is the same as for a new trial on the issue of damages.
 
 See, e.g., Frazier v. Norfolk & Western Railway Co.,
 
 996 F.2d 922, 925 (7th Cir.1993) (“trial judges may vacate a jury’s verdict for excessiveness only when they determine that the award was ‘monstrously excessive’ or that there was ‘no rational connection between the evidence on damages and the verdict’ ”).
 

 a. Back Pay
 

 The defendants contend that the $20,000 in back pay awarded to Ms. Clark and the $14,783.05 in back pay awarded to Ms. Clinton are jury verdicts inconsistent with the evidence introduced at trial and should be reduced.
 

 As to Ms. Clark, the defendants assert that Ms. Clark asked for $19,825 in back pay. Although the back pay awarded to Ms. Clark is only slightly above what she requested, the defendants argue that the greater-than-requested amount is indicative of a deliberative process tainted by passion or sympathy. Plaintiffs Exhibit 37 shows Ms. Clark’s lost income from December 1995 through December 1998 to be $19,825.21. Ms. Clark testified at trial that she was making $2.17 less per hour in her current job than what she’d be making at MCHCC and that she’s working the same number of hours per week. At MCHCC, Ms. Clark worked 40 hours per week. There are 17 weeks from January 1 through the end of the trial, May 3. 17 weeks at 40 hours per week at $2.17 per hour exceeds the difference between $20,-000 and $19,825. The jury’s award of $20,-000 is within the scope of the evidence at trial.
 

 As to Ms. Clinton, the defendants contend that undisputed evidence demonstrated that Ms. Clinton was earning about $475.00 per week from MCHCC when she was laid off and that she was offered the opportunity to return to work on February 20, 1995, about five weeks after her layoff, making her total wages lost to be no more than $3,325.00. The defendants also point out Ms. Clinton’s admissions that 1) MCHCC told her that she could reapply for a position once her medical condition improved, 2) her condition was fully improved by February 20, but 3) she never sought another position at MCHCC. Positions were available on February 20. The defendants contend that Ms. Clinton failed to mitigate her damages and that the MCHCC is not liable for back pay for that period of time.
 

 The jury was instructed to include consideration of the duty to mitigate when calculating back pay. Instruction No. 17 reads, in part, as follows:
 

 You may award damages for back pay. You must determine the amount of any wages and fringe benefits a plaintiff would have earned in employment with Michigan City Health Care Center up to today if that plaintiff had not been ter-
 
 *980
 
 initiated, minus the amount of earnings and benefits that plaintiff received from other employment during that time. A plaintiff has the duty under the law to “mitigate” damages — that is, to exercise reasonable diligence under the circumstances to minimize his or her damages. Therefore, if you find by a preponderance of the evidence that any plaintiff failed to seek out or take advantage of an opportunity that was reasonably available to the plaintiff, you must reduce that plaintiffs damages by the amount he or she reasonably could have avoided by seeking out or taking advantage of such an opportunity.
 

 Ms. Clinton says that Plaintiffs Exhibit 16 summarizes her lost income, and that the amount of that lost income as testified to by Ms. Clinton was $35,948.71. Ms. Clinton also testified that since January 1, 1999, she has lost $1,000 per month. Once a plaintiff has established the amount of damages she claims resulted from her employer’s conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts.
 
 See Gaddy v. Abex Corp.,
 
 884 F.2d 312, 318 (7th Cir.1989). Ms. Clinton argues that the defendants failed to prove the defense because the weight of the evidence compelled the jury to conclude that Ms. Clinton never received a bona fide offer from MCHCC to return to work.
 

 To establish the affirmative defense of a plaintiffs failure to mitigate damages, the defendants had to show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence.
 
 See Gaddy v. Abex Corp.,
 
 884 F.2d at 318. The defendants reply that they clearly met the burden because the undisputed evidence at trial established that the defendants invited Ms. Clinton to call back for a position when she was physically able to work, which was February 20, but she did not do so.
 

 Instruction No. 17 required the jury to reduce damages if they found by a preponderance of the evidence that Ms. Clinton failed to seek out or take advantage of an opportunity to mitigate. The evidence at trial showed that Ms. Sandy Steward or Ms. Sherry Harrison
 
 [1]
 
 called Ms. Clinton on February 9 and offered her a job. Ms. Clinton accepted. Ms. Cathy Paradise, knowing that Ms. Clinton had recently been in a car accident, then called Ms. Clinton and told her she could not come back until the doctor released her to full duty. When Ms. Clinton said she would not have full duty until February 20, Ms. Paradise told her she didn’t have a job and that she should call back to see if anything was available when she could have full duty. Ms. Clinton started working elsewhere on February 20. It is reasonable for the jury, based on the evidence at trial, to have concluded that Ms. Clinton never received a bona fide offer to return to work, and no matter how diligent her inquiries to MCHCC about openings on February 20 or beyond, no opportunity of employment for Ms. Clinton at MCHCC existed with Jackie Wroblewski or Cathy Paradise at the helm.
 

 b. Compensatory Damages Award
 

 The defendants claim that the compensatory damages awards for Ms. Clark ($150,000) and Ms. Clinton ($100,000) are not rationally related to the evidence and are excessive in comparison to awards in similar cases and so must be reduced. In reviewing a compensatory damages award, the court asks three questions: “whether the award is ‘monstrously excessive’; whether there is no rational connection between the award and the evidence . ..;
 
 *981
 
 and whether the award is roughly comparable to awards made in similar cases.”
 
 United States E.E.O.C. v. AIC Security Investigations, Ltd.,
 
 55 F.3d 1276, 1285 (7th Cir.1995).
 

 Ms. Clark testified at trial that as a result of being fired on December 19, 1995 — one week before Christmas — she suffered the embarrassment, humiliation, emotional pain, and mental anguish of telling her three children that there would be no Christmas in the Clark home in 1995. She also had to tell her daughter, a high school senior, that there was no money for her daughter’s once-in-a-lifetime senior class trip, that she could not financially help her daughter fulfill her dream of going to college, and that because she could get no credit after losing her job, her daughter’s student loan would not go through. Ms. Clark suffered embarrassment and humiliation at work when wrongfully accused of patient neglect. Physically, Ms. Clark has experienced stress, headaches, sleeplessness, and an upset stomach. She has not seen a doctor or other health care professional because she had no money and no health insurance, and she had to feed, clothe, and raise her children with what she did have. Ms. Clark testified that she suffered emotional distress from being unemployed and that the loss of her job destroyed her financially — her car was repossessed, she was sued by her creditors, her wages have been garnished, she lost (and still cannot get today) credit cards or credit at any stores. Ms. Clark also testified that she had been unemployed for about two years before working for MCHCC and that she was terminated from her last job before working at MCHCC.
 

 Ms. Clinton testified that because of her color she was forced to resign her position as unit director; she did not receive the same wages as her peers; she was required to attend a meeting with her peers in which her performance was discussed and she was ridiculed and embarrassed; she was repeatedly told that positions for LPNs were not available on the medical specialty unit (MSU) even though less experienced white LPNs were given jobs there; she was subjected to intense scrutiny and was called into the administrator’s office to explain her action after filing a charge of discrimination; she was selected for layoff when a less senior white LPN retained her position; she was toyed with and lied to regarding a bogus return-to-work call after her layoff.
 

 The' defendants argue that neither Ms. Clark nor Ms. Clinton sought the assistance of mental health or other medical professionals for their mental sufferings or physical manifestations. Both testified that they lacked health insurance or money to do so. But in any case, medical and other expert evidence is not required to support a compensatory damages award for emotional distress.
 
 See Kim v. Nash Finch Co.,
 
 123 F.3d 1046, 1065 (8th Cir. 1997). The jury reasonably could have found, that as a result of this discrimination, Ms. Clark and Ms. Clinton suffered emotional pain and were embarrassed and humiliated and that Ms. Clinton continues to suffer today due to the conflict between her human emotions and her religious beliefs. This evidence amply supports an award of compensatory damages for emotional suffering and, in Ms. Clark’s case at least, for physical suffering. Nonetheless, when the evidence in this case is compared to other cases, it cannot be said to support verdicts of $150,000 and $100,000.
 

 In
 
 United States E.E.O.C. v. AIC Sec. Investigations, Ltd.,
 
 55 F.3d 1276 (7th Cir. 1995), a jury determined that the plaintiff, a terminally ill brain cancer patient, was discharged from his job in violation of the Americans with Disabilities Act. The plaintiff claimed damages for the emotional stress endured in being cut off from one of the major defining aspects of his life and in having to watch his family suffer emotionally and financially as a result of the defendant’s actions. As one faced simultaneously with the burden of his own impending death and with his resulting ina
 
 *982
 
 bility to continue to provide for those who depend upon him, the district court found, and the Seventh Circuit agreed, that the plaintiffs “emotional burden was considerably greater than that suffered by the ordinary victim of a wrongful discharge.” The Seventh Circuit affirmed the $50,000 compensatory damages award for the extraordinary victim.
 
 [2]
 

 See id.
 
 at 1286.
 

 The Sixth Circuit recently affirmed a $50,000 non-economic compensatory damages award in a race discrimination case.
 
 See Moore v. KUKA Welding Systems & Robot Corp.,
 
 171 F.3d 1073 (6th Cir.1999). From 1994 through 1996 the African-American plaintiff in
 
 Moore
 
 was denied promotion and was subject to pay disparity and racial slurs because of his race, and was isolated at his white supervisor’s direction in retaliation for filing a discrimination charge. The damages award compensated the
 
 Moore
 
 plaintiff for the injuries he suffered while enduring a hostile environment, the injuries due to his employer’s retaliation, and the injuries for his constructive discharge. While Ms. Clark and Ms. Clinton suffered and were injured, their suffering and injuries are not comparable in length or severity to that of the
 
 Moore
 
 plaintiff, yet their verdicts were two and three times what the
 
 Moore
 
 plaintiff received as compensation for his emotional injuries.
 

 The plaintiffs cite to
 
 Baty v. Willamette Indus., Inc.,
 
 985 F.Supp. 987 (D.Kan.1997) as a comparable case in which the district court upheld a jury verdict of $120,000 in compensatory damages for emotional distress. While both this case and
 
 Baty
 
 resulted in verdicts of more than $100,000 for emotional damages, that is where the similarity ends. The
 
 Baty
 
 plaintiff, like the
 
 Moore
 
 plaintiff, was compensated for the emotional injuries and two years of post-traumatic distress resulting from conduct including months of a steady barrage of opprobrious sexual comments and explicitly sexual and vulgar graffiti about the plaintiff painted on bathroom and workroom walls in her workplace.
 

 Cases similar to Ms. Clark’s and Ms. Clinton’s have consistently resulted in lower compensatory damage awards. See, e.g.
 
 Lindale v. Tokheim Corp.,
 
 145 F.3d 953, 958-959 (7th Cir.1998) (noting that award of $25,000 in compensatory damages could not have stood even if a violation of Title VII had been proved in the absence of any evidence of significant emotional injury or other circumstances of aggravation);
 
 Dubin v. Lagrange Country Club,
 
 No. 95 C 5316, 1997 WL 323831, at *2, (N.D. Ill. June 11, 1997) (upholding jury award of $40,000 for compensatory damages in sexual harassment case for injury to reputation, humiliation, embarrassment, and emotional distress);
 
 Williams v. Pharmacia, Inc.,
 
 956 F.Supp. 1457 (N.D.Ind. 1996) (jury’s compensatory award for emotional damages reduced by district court to $40,000);
 
 Sassaman v. Heart City Toyota,
 
 879 F.Supp. 901 (N.D.Ind.1994) (jury award of $2000 in compensatory damages for emotional pain, suffering, inconvenience, and metal anguish associated with sexual harassment claim);
 
 Fleming v. County of Kane,
 
 898 F.2d 553 (7th Cir. 1990) (jury’s compensatory award of $120,-000 for emotional damages reduced by district court to $40,000);
 
 see also, e.g., Robinson v. Instructional Systems, Inc.,
 
 80 F.Supp.2d 203 (S.D.N.Y.2000) (jury award of $6,000 compensatory damages for mental anguish and suffering for a two-year employee who was wrongfully discharged in retaliation for filing an E.E.O.C. race discrimination charge);
 
 McIntosh v. Irving Trust Co.,
 
 887 F.Supp. 662 (S.D.N.Y. 1995) (district court remitted finding compensatory damages excessive and an award of $20,000 compensatory damages
 
 *983
 
 proper for mental anguish and emotional injury in wrongful termination claim).
 

 Assessing damages for distress from racial discrimination in employment necessarily is an inexact task, and there are many standards under which the awards to Ms. Clark and Ms. Clinton are perfectly defensible. The jury did not have the benefit of knowledge of these other cases, though, and the law requires the court to consider similar cases in evaluating the reasonableness of the damages award. Such a comparison leads the court to conclude that the compensatory awards must be reduced to $50,000 for Ms. Clark and to $85,000 for Ms. Clinton.
 

 c.
 
 Punitive Damages Award
 

 The defendants also ask the court to vacate or reduce dramatically the punitive damages award or order a new trial on punitive damages because the plaintiffs are not automatically entitled to punitive damages, the plaintiffs did not establish reprehensible conduct by the defendants, the punitive damage award is excessive when compared to other cases, and the plaintiffs are not entitled to damages under
 
 Kolstad v. American Dental Assoc.,
 
 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), a decision rendered after the trial in this case. Both parties briefed the effect of
 
 Kolstad
 
 on the punitive damages issue.
 
 [3]
 

 i. Malice/Reckless Disregard
 

 An employer can be held liable for punitive damages in a Title VII case when the employer “engage[s] in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the [plaintiffs] federally protected rights.” 42 U.S.C. § 1981a(b)(l). The punitive damage standard — which is higher than that for compensatory damages — does not require that the plaintiff show egregious or outrageous conduct independent of the employer’s state of mind, but does require that the plaintiff show that an employer discriminated in the face of a perceived risk that its actions violated federal law.
 
 Kolstad, v. American Dental Assoc.,
 
 119 S.Ct. at 2124-2126.
 

 In accordance with 42 U.S.C. § 1981a, the jury was instructed that it could award punitive damages if it found first “that defendants’ conduct was motivated by evil motive or intent or by reckless or callous indifference to [the plaintiffs’] right to be free from intentional discrimination and/or retaliation in
 
 employment.”
 

 [4]
 

 The jury was not, and would not be under
 
 Kolstad,
 
 required to find reprehensible conduct in the evidence presented at trial.
 

 There was ample evidence that the employment discrimination that occurred here was undertaken with malice, or at least with reckless disregard of the federally protected civil rights of Ms. Clinton and Ms. Clark. The jury reasonably could have found that in the pre-ServiceMaster days, Ms. Clinton, the only African-American unit director, had completed a probationary period as unit director and was due for a salary increase in salary. Her raise was denied when ServiceMaster took over, leaving Ms. Clinton’s pay lower than the white unit managers. Within a matter of weeks after ServiceMaster took over, Ms.
 
 *984
 
 Clinton was told she would be fired if she did not resign her unit manager position, or be fired, with a baseless charge of hiring too many African-Americans and an allegation of favoritism toward African-American employees.
 

 Ms. Clinton agreed to step down as unit manager, and repeatedly sought transfer to the MSU, which was the highest paying unit at the health care center. The jury could have found that over a five-month period, Ms. Clinton was told regularly that there were no positions available on that unit, and that during four of those five months, the unit’s director (Peggy Bur-dick) requested that Ms. Clinton be transferred to the unit. The jury could have found that despite what Ms. Clinton was told, there were openings on the unit, that white nurses got those jobs, and that Ms. Burdick also was refused permission to allow another African-American nurse to return to work after pregnancy leave.
 

 The jury also could have found that when ServiceMaster took over, there were three African-American nurses on the MSU — Ms. Clark, Alisa Mitchell, and Dillard Scott — and that Cathy Paradise (perhaps under the direction of Jackie Wrob-lewski) directed the dismissal or layoff of each of those nurses, while referring to the African-American nurses with phrases such as “their kind.” Ms. Burdick’s recommendation to lay off a white nurse when a layoff was required was ignored. Ser-viceMaster eventually demanded Ms. Bur-dick’s resignation, and the jury could have found that ServiceMaster falsified its records to support that demand.
 

 Soon after Ms. Burdick’s departure, Ms. Clark received a verbal warning for something the jury could have found to have been pretextual. That warning was increased to a discharge for patient neglect, and the jury could have found that white nurses who might have been involved in the event were not disciplined. The jury could have found that upon Ms. Clark’s discharge, she was presented with falsified records of past poor performance, and that the events for which she was discharged would not have warranted even lesser discipline under health care center policies. The jury could have found that white nurses had been retained despite conduct for which the policies required immediate termination.
 

 The plaintiffs argued to the jury that the defendants were trying to get rid of all African-American nurses in the MSU, and the jury heard evidence concerning the dismissals of Dillard Scott and Alisa Mitchell. Although the jury was unable to reach a verdict on their claims, the jury could have unanimously believed that the discharge of either Mr. Scott or Ms. Mitchell was racially motivated (while disagreeing as to whose). A finding that the defendants were engaged in racially-motivated terminations at the same time they were firing Ms. Clinton and Ms. Clark would lead unerringly to an inference that the dismissals of Ms. Clinton and Ms. Clark were malicious or, at best, were done in reckless disregard of federally protected civil rights. By the end of January 1996, after Ms. Clark was fired, after Ms. Clinton and Mr. Scott were laid off, and after Ms. Scott was transferred involuntarily, no African-Americans remained on the MSU.
 

 On the day Ms. Clark was fired, Mr. Scott was told that he was being laid off due to a low patient census. The jury reasonably could have found that the patient census was not low and that Mr. Scott had more seniority than any other LPN on the unit. The next day, Ms. Clinton filed a charge of discrimination with the Michigan City Human Rights Commission. Within a matter of days, Ms. Clinton and Mr. Scott were laid off while less senior white nurses were not laid off. The jury could have found that the defendants almost immediately began hiring white nurses after laying off Ms. Clinton and Mr. Scott. The jury also could have found that the defendants gave explanations they knew to be false about the reasons for selecting Ms. Clinton and Mr. Scott for layoff.
 

 
 *985
 
 This evidence is more than ample to support the finding — a finding the jury was properly instructed that it had to make — that the adverse actions against Ms. Clinton and Ms. Clark were undertaken with malice or with reckless disregard of the federally protected civil rights of Ms. Clinton and Ms. Clark.
 

 The evidence also was more than sufficient to impute liability for punitive damages to the defendants. Under
 
 Kolstad,
 
 it is sufficient if the wrongdoer was serving in a “managerial capacity” and committed the wrong while “acting in the scope of employment.”
 
 See Kolstad v. American Dental Assoc.,
 
 119 S.Ct. at 2128. The defendants first argue that Ms. Wroblew-ski and Ms. Paradise were too unimportant in the defendants’ corporate schemes to qualify as “managerial agents,” but the argument is unpersuasive. Larry Butler (the President of both the Metro corporations) and Ms. Wroblewski testified without dispute that on a daily basis, nobody had more power or authority to determine personnel issues than did Ms. Wroblewski, though Ms. Wroblewski said the department heads also had the power to hire and fire employees. Ms. Wroblewski’s signature was on the termination notices of both Ms. Clinton and Ms. Clark.
 

 The defendants gave Ms. Wroblewski the authority to terminate Ms. Clinton and Ms. Clark. She had absolute discretion in doing so. She terminated Ms. Clinton within three days of receiving notice of the filing of the discrimination charge with the Michigan City Human Rights Commission. She terminated Ms. Clark in the same time frame for offenses for which white employees received reprimands.
 
 See Kol-stad v. American Dental Assoc.,
 
 119 S.Ct. at 2128 (in determining whether an employee is a managerial agent, the court should review the type of authority that the employer gave to the wrongdoing agent, the amount of discretion that the agent has in what was done, and how the discriminating act was accomplished). Ms. Wroblewski and Ms. Paradise may not have been “top management” of the defendants’ corporations, but they were “important” and were acting in a managerial capacity and carried out contractual duties of hiring and firing personnel in the scope of their employment.
 

 If this case were being tried today, the defendants likely would raise the affirmative defense articulated in
 
 Kolstad.
 
 “Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.”
 
 Kolstad v. American Dental Assoc.,
 
 119 S.Ct. at 2129. Because Title VII is prophylactic in nature with “aims, chiefly, ‘not to provide redress but to avoid harm,’ ” punitive damages is subject to a good-faith defense.
 
 Id.
 
 (“in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer’s good-faith efforts to comply with Title VII”). Once a managerial agent is found to be high enough to impute liability, it is a defense that the principal has, in good faith, taken the steps necessary to keep discrimination out of its workplaces.
 

 That defense was not raised in the pretrial order or in the instructions conference, and (perhaps as a consequence) the record may not contain all of the evidence that would have been pertinent to this issue. The court agrees with
 
 Dejfenbaugh-Williams v. Wal-Mart, Stores, Inc.,
 
 188 F.3d 278, 283-284 (5th Cir.1999), that since the statutory punitive damages structure is built on the heritage of the Restatements of Agency and Torts, the affirmative defense announced in
 
 Kolstad
 
 is not so great a break with prior law as to allow the issue to be raised for the first time on a post-trial motion.
 

 ii. Excessiveness
 

 The next question to be resolved is whether the award were excessive. As noted before, Ms. Clinton and Ms. Clark each were awarded $150,000.00 in punitive damages. That inquiry is covered only in
 
 *986
 
 part by
 
 Kolstad;
 
 the lion’s share of the guidance comes from
 
 BMW of North America, Inc. v. Gore,
 
 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The
 
 BMW
 
 Court addressed the constitutionality of a punitive damages award rather than the more pedestrian inquiry of excessiveness, but its guideposts have been used to test excessiveness,
 
 see Fall v. Indiana Univ. Bd. of Trustees,
 
 33 F.Supp.2d 729, 744 (N.D.Ind.1998) (collecting cases), and the parties’ briefs agree that
 
 BMW
 
 should steer the inquiry in this case. The
 
 BMW
 
 Court articulated three guideposts: the reprehensibility of the defendants’ conduct, the ratio between the compensatory and punitive damages (a guidepost that is not intended to serve as an inflexible mathematical barrier), and the award’s similarity to civil or criminal penalties that could be imposed for comparable misconduct.
 
 See
 
 517 U.S. at 575-583, 116 S.Ct. 1589.
 

 Kolstad
 
 casts a shadow on the guidepost of reprehensibility, since the
 
 Kolstad
 
 Court unmistakenly said that the right to punitive damages under the Civil Rights Act of 1991 depends on the defendant employer’s mental state rather than the egregiousness or outrageousness of the employer’s conduct. 119 S.Ct. at 2124. A simple overlay of
 
 Kolstad
 
 and
 
 BMW
 
 would imply that a plaintiff might be entitled to punitive damages if malice or reckless disregard is proven, but the award cannot exceed a dollar or two unless the conduct is marked by reprehensibility (unless the courts áre to begin to draw a line between reprehensibility on the one hand and egregiousness or outrageousness on the other). Such concerns needn’t slow the inquiry in this case, though, because in the context of the nation’s employment discrimination laws, the jury could have found that the defendants’ conduct was reprehensible— and the jury was instructed to consider whether it was necessary to punish the defendants for outrageous conduct. As discussed above, when the evidence is viewed in the light most favorable to the plaintiffs, Ms. Clinton and Ms. Clark were victims of a broader swath of racial discrimination in their workplace, a pattern of conduct that employed lies and slander successfully to eliminate all African-American nurses from the facility’s premier unit while duplicitously adding white nurses.
 

 As was discussed with respect to the compensatory damages awards, the harm to these plaintiffs was not purely economic. There was evidence of bad faith, of false statements, of affirmative misconduct, and concealment of improper motive in the sense of manufacturing false paperwork and making false statements to the Michigan City Human Rights Commission to conceal the discriminatory motive. The amounts of these punitive damages awards are not disproportionate to the reprehensibility of such a course of conduct.
 

 The second
 
 BMW
 
 inquiry compares the punitive damages award to the compensatory damages award — a challenging undertaking when the court has ordered a remittitur. If the plaintiffs decline the remittitur, it would seem (though the court will afford the parties an opportunity to be heard) that a new trial would be needed on the amount of punitive damages and well as on compensatory damages, so the court here addresses the ratio of these punitive damages awards to the post-remittitur compensatory awards. As to Ms. Clark, the ratio would be 3:1, which is an acceptable ratio, nearly as a matter of law.
 
 See United States E.E.O.C. v. AIC Investigations, Ltd.,
 
 55 F.3d 1276, 1287 (7th Cir.l995)(“statutes routinely double and treble damages awards to deter and punish .... ”). As to Ms. Clinton, the ratio is somewhat higher — 4.28:1—but is a far cry from the ratio condemned in
 
 BMW,
 
 and is nearly identical to the 4.16:1 ratio upheld in
 
 Baty v. Willamette Indus., Inc.,
 
 985 F.Supp. 987 (D.Kan.1997). The punitive damages awards to these plaintiffs are not excessive by reason of their ratio to presumed post-remittitur compensatory damages awards.
 

 Finally under
 
 BMW,
 
 these awards are not rendered excessive by virtue of com
 
 *987
 
 parison with civil or criminal sanctions available for comparable conduct. The parties agree that under applicable damages caps established by the Civil Rights Act of 1991, damages totaling $300,000.00 could be awarded against these defendants, and these combined awards do not approach that figure.
 

 The inquiry cannot stop there; the
 
 BMW
 
 analysis was directed to the issue of constitutionality rather than simply to ex-cessiveness, and rarely will produce a complete inquiry. For example, if the law under which these claims were brought allowed individual liability, and these verdicts were returned against Jackie Wrob-lewski, punitive damages awards aggregating $300,000.00 would be unlikely to stand, not because of any of the
 
 BMW
 
 factors, but rather because unless Ms. Wroblewski has unusual wealth, the award would be disproportionate to the need to deter. In this case, that concern presents no problem. Notwithstanding the defendants’ net worth, the defendants’ average daily income from 1995 to 1998 was $446,178.00.
 

 Claiming these awards are excessive in comparison with other cases, the defendants cite three cases in which substantially lower punitive damages awards were deemed adequate. Those citations are not persuasive, and two are scarcely pertinent. The defendants say that in
 
 Timm v. Progressive Steel Treating, Inc.,
 
 137 F.3d 1008 (7th Cir.1998), the court held punitive damages of $15,000.00 to be appropriate for sexual harassment, but the court addressed only the fact of punitive damages, not their adequacy. The jury had awarded no compensatory damages, and the issue on appeal was whether, as a matter of law, punitive damages could be awarded under such circumstances. The court held punitive damages could be awarded without a compensatory damage award — not the issue here. The defendants similarly describe
 
 Shea v. Galaxie, Lumber & Constr. Co.,
 
 152 F.3d 729 (7th Cir.1998), as holding “punitive damages of only $2,500.00 to be appropriate .... ” on a Title YII sexual harassment claim. The amount of punitive damages was before the court on a challenge by the defendant that they were too high, since the compensatory damages award was $1.00. The court did not hold that the amount of $2,500.00 was “appropriate”; the court held simply that notwithstanding the 2500:1 ratio between the classes of damages, the district court did not abuse its discretion when it refused to order a remittitur.
 
 See Shea,
 
 152 F.3d at 736.
 

 In
 
 Fall v. Indiana Univ. Bd. of Trustees,
 
 33 F.Supp.2d 729 (N.D.Ind.1998), the third case cited by the defendants on this issue, the court ordered a remittitur reducing punitive damages awards totaling $800,000.00 (half on a state law battery claim and the other half on a claim under 42 U.S.C. § 1983), to an aggregate $50,-000.00. Two considerations render that holding of little help in this case, though. First, the incident for which the punitive damages were awarded was a single 30-second event, and the conduct for which the punitive damages were awarded related to a single individual. The conduct for which Ms. Clark and Ms. Clinton were awarded punitive damages spanned several months and was directed at several persons. Second, the
 
 Fall
 
 court examined the damages award in the context of punitive damages awards against individual defendants, while the defendants here are corporations with substantial income.
 

 Fall
 
 is useful, however, for its particularly good statement of the factors that generally govern a motion directed at the excessiveness of a punitive damage award:
 

 The jury’s damage calculations are entitled to great deference, and the Court may only vacate the jury’s verdict if the award is either “monstrously excessive,” “shocks the judicial conscience,” has “no rational connection to the evidence,” or clearly appears “to be the result of passion and prejudice.”
 
 E.g., McNabola v. Chicago Transit Auth.,
 
 10 F.3d 501, 516 (7th Cir.1993);
 
 Levka v. City of Chicago,
 
 748 F.2d 421, 424-425 (7th Cir.1984);
 
 *988
 

 Arlington State Bank v. Colvin,
 
 545 N.E.2d 572, 580 (Ind.App.1989). “An award of punitive damages should be set aside only if it exceeds an amount necessary to achieve the objective of punishment and deterrence.”
 
 Allahar v. Za-hora,
 
 59 F.3d 693, 696 (7th Cir.1995) (citing
 
 Hamilton v. Svatik,
 
 779 F.2d 383, 389 (7th Cir.1985)). “However, ‘a punitive damage award may not constitute merely a windfall to the prevailing party.’ ”
 
 Id.
 
 (quoting
 
 Ramsey v. American Air Filter Co.,
 
 772 F.2d 1303, 1314 (7th Cir.1985)). The decision to set aside a punitive damages award and grant a remittitur is committed to the sound discretion of the district court.
 
 Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,
 
 106 F.3d 1388, 1397 (7th Cir.1997) (citing
 
 Gasperini v. Center for Humanities,
 
 518 U.S. 415, 434-35, 116 S.Ct. 2211, 2223, 135 L.Ed.2d 659 (1996)).
 

 33 F.Supp.2d at 744. There simply is nothing shocking about the size of these punitive damages awards. When the evidence is viewed most favorably to the plaintiffs, the conduct being punished— eliminating qualified African-American nurses from an entire unit simply because of their race, laying them off at Christmas for that reason, and besmirching their reputations as nurses to do so — is far more shocking than the proposition that the defendants should be penalized in an amount equal to two-thirds of a day’s income. Regardless of whether one looks to the compensatory damages actually assessed in the verdict, or to the remittitur award, there is nothing about the verdict that suggests the punitive damages awards resulted from passion or prejudice, and the awards do not exceed an amount that might reasonably be seen as necessary to deter the defendants, who operate many other nursing homes and employ many other nurses.
 

 The punitive damages awards are not excessive.
 

 2. Front Pay and Other Equitable Relief
 

 Ms. Clark and Ms. Clinton seek front pay for a period of five years and other equitable relief consisting of an expungement of their personnel records, a neutral letter of reference, and notice of inquiries concerning their employment at MCHCC along with copies of any letters sent by MCHCC to prospective employers. The defendants object to the front pay request it its entirety and argue that if the court chooses to award front pay, the time period should be no more than for a few months.
 

 Front pay — “ ‘a lump sum ... representing the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment,’ ” — is an equitable remedy available to a district court in Title VII cases where reinstatement is unavailable.
 
 Williams v. Pharmacia,
 
 137 F.3d 944, 952 (7th Cir. 1998) (quoting
 
 Downes v. Volkswagen of America, Inc.,
 
 41 F.3d 1132, 1141 n. 8 (7th Cir.1994)). “An employee receiving front pay in lieu of reinstatement is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment.”
 
 Williams v. Pharmacia,
 
 137 F.3d at 954.
 

 The defendants do not disagree that reinstatement is not possible for these plaintiffs, so front pay is a permissible remedy. Ms. Clark found similar nursing employment within four months after her termination; as of 1998, her pay at Life Care Center was superior to what it would have been had she stayed at MCHCC. Although undisputed trial testimony indicated that Ms. Clark intended to continue her MCHCC nursing career to retirement, the damages that reinstatement/front pay are designed to remedy are mitigated to zero because she moved on to higher-pay
 
 *989
 
 ing employment, and front pay is not a remedy available to Ms. Clark.
 

 The trial evidence supported a reasonable jury finding that the call back of Ms. Clinton in February 1996 was a sham, and that she had no real invitation to return to MCHCC as the defendants argue. Ms. Clinton started working for another employer on February 20, but the employment was inferior in hours and compensation compared to her employment at MCHCC. She found full-time nursing employment once in 1997, but undisputed evidence shows her wage there to have been far inferior to what she would have earned had she stayed at MCHCC. To this day, her nursing career is on a part-time basis and she has been unable to move on to employment similar in hours or compensation.
 

 Ms. Clinton seeks front pay for five years, but she has never worked that long for a single employer. Her testimony indicated that she once left employment at MCHCC to move to another state where she had no employment when she resigned at MCHCC and did not indicate that she (like Ms. Clark) planned to retire as a nurse from MCHCC. Trial testimony indicated that the longest Ms. Clinton has worked as a full-time nurse at any single employer was twenty months from February 1993 to October 1994 — the first time she worked for MCHCC. To remedy the damages of her termination until such time she reasonably could be expected to have moved on, the court awards Ms. Clinton front pay for 10 months at $935.09 per month for a total of $9350.90 (20 months minus the 10 months that had passed since she had returned to MCHCC in February 1995 but before her illegal termination and $11,221.11 per year income lost as of 1998).
 

 Ms. Clinton and Ms. Clark also seek equitable relief in the form of ex-pungements of records, a mandatory letter to be sent in response to requests for employer references, and notification of such requests. The defendants object to some requests, but not to others. With one exception, the court believes the plaintiffs’ requests are reasonable and, in light of the evidence at trial, necessary and appropriate. The exception relates to Ms. Clark’s request to have removed from her personnel file all records relating to the December 6, 1995 verbal warning to her regarding the Dakin solution. The importance of that record’s continued existence is not entirely clear, but no basis exists for its removal. The verbal warning given to Ms. Clark was matched by a verbal warning given to the white nurse who, along with Ms. Clark, might have been responsible for the Dakin solution; no racially discriminatory action occurred until Ms. Clark’s discipline rocketed to dismissal.
 

 The court agrees with the plaintiffs that all records relating to Ms. Clark’s December 19, 1995 discharge should be expunged, as should all records relating to Ms. Clinton’s December 1995 layoff, Ms. Clinton’s February 1996 “recall” to employment, and Ms. Clinton’s termination for not reporting back to work. The evidence demonstrates that each of those instances were motivated by race. Similarly, the court understands that the defendants would prefer not to be required to respond to inquiries from prospective employers with letters saying that they unlawfully discriminated against the plaintiffs, but that’s what the jury found; the court will provide the defendants with an option of saying, instead of the last sentence proposed by the plaintiffs, that Ms. Clark’s or Ms. Clinton’s “employment at the Michigan City Health Care Center ended because of what a jury found to have been an unlawful act of employment discrimination by the Michigan City Health Care Center.” The court cannot conceive of any reason to allow the defendants to provide different information after a year passes. Finally, the court grants the request the defendants be ordered to notify the plaintiffs whenever (within the next ten years) the defendants
 
 *990
 
 receive a request for information about the employment of Ms. Clark and Ms. Clinton.
 

 3. Attorney Fees and Costs
 

 As prevailing parties, Ms. Clinton and Ms. Clark have requested fees, expenses, and costs incurred in the litigation of this case. The defendants object to the fee requests because it includes time not reflected by contemporaneous paperwork, because the defendants contend the hours are excessive, because it includes time spent on claims for other plaintiffs, and because the hourly rates exceed those the plaintiffs had agreed to pay.
 

 a. Undocumented Time
 

 The defendants ask the court to reduce the requested fees for entries in which the plaintiffs have provided no documentation. The plaintiffs responded that all time for which fees' was requested was contemporaneously transmitted to the attorney’s secretary who entered the time in the firm’s automated system. Some time information was transmitted by verbal instruction, some by dictation, and some by time slips, but all was contemporaneously documented in the sense of being entered into computer records at or near the time of the services provided, and the total time is reflected in the electronic record. No reason exists to treat electronic “documentation” differently than, paper. The court will not reduce the time for lack of documentation.
 

 b. Excessive Hours
 

 “[H]ours that are excessive, redundant, or otherwise unnecessary” should be excluded from a fee petition.
 
 See Hensley v. Eckerhart,
 
 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The defendants estimate that the plaintiffs’ fee petition requests 33.3 hours in excessive time and list the hours they estimate to be excessive. The court agrees that the hours spent reviewing the court’s standard orders on scheduling conference and the scheduling order that reflects the parties’ Rule 26(f) report were excessive and should be reduced. The court also agrees that the time to calculate the damages for Margaret Clark (more than twice that needed to calculate damages for Dana Clinton) also was excessive. The court reduces the time by 6.0 hours. In addition, the plaintiffs do not dispute that the .5 hours entry for the Dillard Scott claim should be deducted. The hours spent reviewing Ms. Clinton’s E.E.O.C. file and in exhibit and trial preparation are not excessive. The court reduces the time for excessive hours for a total of 4.1 hours for attorney Phillips and 2.4 hours for attorney Kurek.
 

 c.
 
 Specific Scott and Mitchell Time
 

 The plaintiffs did not reduce the number of hours, on several entries, for time that the defendants argue should be reduced as time attributable to the claims of Dillard Scott and Alisa Mitchell (claims that were tried with those of Ms. Clark and Ms. Clinton, then settled during jury deliberations). The entries in the defendants’ Exhibit D reflect time spent on joint correspondence and filings, meetings, witness interviews, and trial preparation and trial.
 

 As to joint correspondence, filings, and meetings, the court agrees that the time spent on the specific claims of Mr. Scott and Ms. Mitchell, as opposed to general correspondence, filings and meetings affecting all plaintiffs, was less than one-half of the time spent, but not
 
 de minimus
 
 as the plaintiffs suggest. About one-fourth of the original complaint is specific to aggregate claims of Mr. Scott and Ms. Mitchell — the remaining three-fourths is specific to the claims of Ms. Clark and Ms. Clinton or generally regards the litigation, no matter the plaintiffs — and the court reduces the time for drafting that complaint by one-fourth. The court agrees with the plaintiffs that virtually no additional time was spent on the Scott and Mitchell specifics in the amended complaint and the following entries outlined in defendants’ Exhibit D to its response to the fee petition: 5/22/97, 6/11/97, 6/12/97, 7/21/98, 7/25/97,
 
 *991
 
 8/21/97, 9/5/97, and 9/8/97. The court will not reduce the times associated with these entries as they reflect general preparation required no matter the plaintiffs. With respect to the rest of the items on Defendants’ Exhibit D, it appears that the defendants are correct that the inclusion of the Scott and Mitchell claims caused additional time to be expended. The plaintiffs culled discrete times spent on those claims before submitting their petition; the court must determine a reasonable, yet artificial, method of reducing the award so as to reflect the time that would have been spent had only the successful Clark and Clinton claims been the subject of the proceedings. The court turns to the trial for guidance.
 

 The plaintiffs argue that trial time should not be reduced, or should be reduced by only four to eight hours because had they not been plaintiffs to the action, Mr. Scott and Ms. Mitchell would have been witnesses at trial. The plaintiffs also say they have not included the time spent preparing Mr. Scott and Ms. Mitchell for trial or, with a .5 hour exception, the time spent preparing testimony regarding their respective damages in the fee petition.
 

 The court agrees with that analysis to a point, but the trial time devoted to Mr. Scott and Ms. Mitchell would have been considerably less had their only role been to help prove discrimination against Ms. Clark and Ms. Clinton. Evidence of the alleged discrimination’s impact on Mr. Scott and Ms. Mitchell would have been unnecessary, and even the evidence of their treatment would, based on the court’s experience with such evidence, have been less detailed. How much less detailed is, of course, a matter on which agreement is unlikely, but it is the court’s responsibility to award, as closely as reasonably can be done, only those fees that were reasonable and necessary for the successful claims.
 
 See Hensley v. Eckerhart,
 
 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Accordingly, the court approaches its task as follows: the court has reviewed the time of each witness on the stand and the content of the testimony of each witness and has determined that about seven hours and twenty-two minutes of trial time was specific to the claims of Mr. Scott and Ms. Mitchell.
 
 [5]
 
 The court believes that the testimony specific to Mr. Scott and Ms. Mitchell would have taken only half that time had they not been plaintiffs at trial, so 3.5 hours of the claimed trial time must be considered unnecessary to the successful claims — and that.would be 3.5 hours for each attorney and paralegal.
 

 The evidence itself took 24.5 hours to present, so the 3.5 hours attributable solely to the Scott and Mitchell claims amounted to 14 percent of the time devoted to the presentation of evidence. No better indi-cia appearing of the proper reduction to apply to the hours expended by the plaintiffs’ trial team, the court applies that 14 percent figure to the rest of the items in Defendant’s Exhibit D, producing reductions under this formula of 46.8 hours for attorney Phillips, 30.3 hours for attorney Kurek, and 4.1 hours for paralegal Kring. In addition, the court subtracts 3.5 hours of trial time for each. An additional .5 hours for Paralegal Kring was redacted by the plaintiffs.
 

 d. Reasonable Fee
 

 Finally, the defendants request that the court reduce the fee because the average hourly fee is greater than the contractual fee agreed to by the plaintiffs. A review of the fee agreement shows that the $150.00 per hour figure was only half of the proposal. The “or” part of the agreement leads to a much higher hourly fee. The hourly fees of $175.00, $150.00, and $75.00 for Mr. Phillips, Ms. Kurek, and paralegal Tracy Kring, respectively,
 
 *992
 
 are fair and reasonable in light of the customary charges for similar services in this geographical area.
 

 For the reasons stated above, the court reduces the amount of fees recoverable by Ms. Clark and Ms. Clinton as follows: attorney Phillips — $9,170.00 (52.4 hours at $175 per hour); attorney Kurek — $4,525.00 (36.2 hours at $125 per hour); and paralegal Kring — $607.50 (8.1 hours at $75 per hour). The total amount of allowable attorneys fees is $114,858.75.
 

 The defendants do not object to the following litigation expenses and costs requested in the plaintiffs’ fee petition that total $5,018.48: court reporter expenses— $1895.90; photocopying expenses— $1294.95; filing fees — $150.00; long distance toll charges — $88.72; milage and parking expenses — $735.40; and witness fees and process server expenses— $853.51.
 

 Pursuant to the provisions of 42U.S.C. § 2000e
 
 el seq.,
 
 42 U.S.C. §. 1988, and Local Rule 54.1, the court awards $119,877.23 in fees, expenses, and costs to Ms. Clinton and Ms. Scott.
 

 4.
 
 Conclusion
 

 For the reasons stated above, the court
 

 (1) GRANTS IN PART and DENIES IN PART the defendants’ motion for a new trial or to alter judgment [Docket No. 109]. Unless within 10 days of the date of this order, Ms. Clark files a remittitur of $100,000 and Ms. Clinton files a remittitur of $65,000 of the judgment heretofore entered insofar as compensatory damages, the judgment as to compensatory damages will be vacated and a new trial will be granted solely as to the amount of compensatory damages to be awarded. The court DENIES the motion insofar as the back pay award.
 

 (2) GRANTS IN PART and DENIES IN PART plaintiffs’ motion for front pay [Docket No. 104]. The court:
 

 (a) AWARDS Ms. Clinton $9350.90 in front pay;
 

 (b) ORDERS the defendants to expunge all records relating to Ms. Clark’s December 19, 1995 discharge, all records relating to Ms. Clinton’s December 1995 layoff, all records relating. to Ms. Clinton’s February 1996 “recall” to employment, and all records relating to Ms. Clinton’s termination for not reporting back to work;
 

 (c) ORDERS the defendants and their agents to provide the following letter of reference to any future prospective employer of Ms. Clark (the defendants may choose either of the final sentences, but must use one or the other): “The letter is to respond to your request for information concerning the employment of Margaret Clark at the Michigan City Health Care Center. Ms. Clark was employed at the Michigan City Health Care Center from June 4, 1994 until December 19,1995. At the conclusion of her employment, Ms. Clark was working as an LPN in the Medical Specialty Unit at the Michigan City Health Care Center. [Ms. Clark’s employment at the Michigan City Health Care Center ended because an unlawful act of employment discrimination by the Michigan City Health Care Center.] OR [Ms. Clark’s employment at the Michigan City Health Care Center ended because of what a jury found to have been an unlawful act of employment discrimination by the Michigan City Health Care Center.]”;
 

 (d) ORDERS the defendants and their agents to provide the following letter of reference to any future prospective employer of Ms. Clinton (the defendants may choose either of the final sentences, but must use one or the other): “The letter is to respond to your request for information concerning the employment of Dana Clinton at the Michigan City Health Care Center. Ms. Clinton was employed at the Michigan City Health Care Center from February 22, 1995 until Decern-
 
 *993
 
 ber 28,1995. At the conclusion of her employment, Ms. Clinton was working as an LPN in the Alzheimer’s unit at the Michigan City Health Care Center. [Ms. Clinton’s employment at the Michigan City Health Care Center ended because an unlawful act of employment discrimination by the Michigan City Health Care Center.! OR [Ms. Clinton’s employment at the Michigan City Health Care Center ended because of what a jury found to have been an unlawful act of employment discrimination by the Michigan City Health Care Center.]”;
 

 (e) ORDERS the defendants to notify Ms. Clark and/or Ms. Clinton whenever (within the next ten years) the defendants receive a request for information about the employment of Ms. Clark or Ms. Clinton.
 

 (3) GRANTS IN PART and DENIES IN PART the plaintiffs’ petition for fees, expenses and costs [Docket No. 105] and AWARDS $119,877.23 in fees, expenses, and costs to Ms. Clinton and Ms. Clark.
 

 SO ORDERED.
 

 [1]
 

 . Ms. Clinton testified that Sandy Steward called her; Ms. Harrison said she called Ms. Clinton; Ms. Steward did not testify.
 

 [2]
 

 . As Ms. Clark and Ms. Clinton point out,
 
 AIC
 
 does not address the question of whether a larger award — such as of $100,000 to $150,-000 — would be appropriate. To the contrary,
 
 AIC
 
 suggests that while $50,000 was not monstrously excessive, the plaintiff may have gotten more that he deserved.
 
 See
 
 55 F.3d at 1286 ("it may be that Wessel did not really deserve as much as $50,000, but that is not the question.”).
 

 [3]
 

 .
 
 Kolstad
 
 was decided after the plaintiffs responded to the defendants’ post-trial motions, but before the defendants' reply. The defendants briefed the effect of
 
 Kolstad
 
 in their reply brief and the plaintiffs briefed the effect of
 
 Kolstad
 
 in a supplemental briefing.
 

 [4]
 

 . Before the trial began, the defendants objected to the plaintiffs’ proposed punitive damages instruction on the grounds that the plaintiffs could not produce any evidence at trial that would support giving the instruction. The court determined that the evidence supported giving a punitive damages instruc-lion and eventually gave the plaintiffs' tendered instruction. Along with their objection to the plaintiffs’ proposed instruction, the defendants requested the right to submit an instruction at the close of evidence if such an instruction was warranted. On day seven (of eight) of the trial, the defendants tendered a punitive damages instruction. While the defendants' tendered instruction was not used, it is of note that the tendered instruction did not require reprehensible conduct to support an award for punitive damages, conduct the defendants now argue was required.
 

 [5]
 

 . Ms. Mitchell testified for 1:51 on April 28 and for 1:40 on April 29, Mr. Scott testified for 1:30 on April 29 and for 1:21 on April 30. About an hour was spent on Mr. Scott and Ms. Mitchell, all told, in the testimony of Mary Peebles on May 1, and the May 3 testimony of Linda Freeman, Sherry Harrison, and Cathy Paradise.