Joy R. SHEA, Plaintiff–Appellant, Cross–Appellee,

v.

GALAXIE LUMBER & CONSTRUCTION COMPANY, LTD., Defendant–Appellee, Cross–Appellant.

Nos. 97–1379, 97–1827.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1997.

Decided Aug. 19, 1998.

Ernest T. Rossiello (argued), Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant, Cross–Appellee.

Bradley B. Falkof (argued), Melissa A. Vallone, Barnes & Thornburg, Chicago, IL, Allen B. Glass, Glass & Weiner, Chicago, IL, for Defendant–Appellee, Cross–Appellant.

Before COFFEY, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Joy Shea worked as a receptionist and office assistant at Galaxie Lumber & Construction Company for about a year and a half, from June 1992 until January 1994. Toward the end of her tenure there, she complained to the company's president, Steven Pinsler, that she was not receiving the overtime pay to which she was entitled under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a). Her complaints were unavailing, which prompted her to resign. She later filed this lawsuit against Galaxie, raising unpaid overtime and retaliation claims under the FLSA, 29 U.S.C. §§ 207(a), 215(a)(3), and a sexual harassment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). A jury found in her favor.

The dispute now before us on Shea's appeal, No. 97–1379, relates to the district court's decision to deny Shea liquidated and punitive damages on her FLSA claims, and the court's decision to award her lawyers only about one-fifth of the fees and costs they requested. Galaxie has cross-appealed, No. 97–1827, claiming that the district judge erred in rejecting its motion for remittitur on the punitive damages the jury awarded on Shea's Title VII claim.

**I**

*A. FLSA Claim*

Donna Ruzecki was the office manager at Galaxie who initially hired Shea to be the company's receptionist. Ruzecki informed Shea that her hours were to be 8:30 a.m. to 4:30 p.m., Monday through Friday, and 9:00 a.m. to 12:00 p.m. every other Saturday. Ruzecki also instructed Shea to keep track of her hours by recording them by hand on timecards, which Ruzecki collected. From the start, Galaxie did not pay Shea at a rate of one-and-a-half times her ordinary hourly wage for her three extra Saturday hours. Instead, it paid her "straight time," as it also did when she worked longer hours during the week. Testimony at the trial indicated that Shea often worked at Galaxie until 6:00 p.m. or later during the week, and that her three-hour duty on alternate Saturdays frequently stretched to four or five hours.

In August 1992, Galaxie changed its method of paying Shea from an hourly system to a flat weekly wage of $250 per week. After this change, she continued to work her basic 40 hours per week, extra hours on weekdays, and alternate Saturdays. She received no additional compensation for hours worked in excess of 40 per week. In November 1992, Galaxie increased Shea's salary to $300 per week; her work hours continued to exceed 40 per week. In December 1992 Ruzecki left the company and many of her duties were reassigned to Shea, including preparing payroll, accounts payable, and accounts receivable, and writing (but not signing) checks. Shea received another raise—to $325 per week—but not a formal promotion. At this point, she often worked from 8:30 a.m. until 6:00 or 7:00 p.m. weekdays, and she began to work every Saturday. Although Galaxie installed a time clock in December 1992, Shea apparently did not need to submit timecards to anyone after Ruzecki's departure. She received her last raise in February 1993, to $350 per week. Beginning in late August of that year, she was authorized to prepare extra checks for management signature that compensated her on a straight time basis for the 13 or so overtime hours she worked each week. (Shea did not know that she might have been entitled to the higher multiple established by the FLSA.) Galaxie representatives signed those checks, even though Pinsler testified at trial that he did not believe Shea was entitled to any overtime for the period from August 1993 to January 1994, because she took the job knowing that she would have to work more than 40 hours per week to get her work done.

Not until December 1993 did Shea begin complaining to management about her lack of overtime pay. Her complaints elicited a strong reaction from Pinsler, who stormed into her office in a rage, swearing at her, sweeping objects off her desktop onto the floor, and shouting that she was not worth the overtime pay she wanted. Shortly after this incident, Shea tendered her resignation to the company. Pinsler's brother Bruce, also a Galaxie executive, responded by offer-

ing her a raise to $450 or $500 a week if she would stay, but she declined.

### B. Title VII Claim

During the time of Shea's employment, Galaxie had no written policy forbidding sexual harassment in the workplace. Pinsler believed it was understood that sexual harassment would not be tolerated and believed such a policy was unnecessary. According to testimony at trial, he was too optimistic, and too hypocritical. Beginning in December 1992 or early 1993, Pinsler's father Leon (a consultant to the company) would sidle up to Shea, hug her, kiss her, pat her bottom, and whisper in her ear. Witnesses confirmed Shea's account of these events. Leon also repeatedly told Shea that he thought the two made a great couple and that he wished they could have sex. Shea tried laughing it off, but she eventually became exasperated enough to order him to stop. He did not. On one occasion, he came up behind her and grabbed her breasts.

Not to be outdone by his father, at some time after December 1992, Pinsler told Shea that his wife was out of town, and invited her to come to his house for a tryst. At trial, Pinsler admitted that the conversation had taken place, but he brushed it off as "kidding." After that, he began on a daily basis to ask Shea to perform fellatio on him. Shea felt degraded and humiliated by these remarks. In early 1993, after Galaxie had completed some work for a trade show at the O'Hare Expo Center (now known as the Rosemont Convention Center), Pinsler asked Shea and her co-worker if he could go to their hotel room with them and have sex. Later, while Shea and her fiancé were on a cruise that Shea had earned as a company bonus, Pinsler, his father, and his brother all commented to Shea (in the presence of the fiancé) that she had beautiful breasts and that they wished they could touch them. Shea was embarrassed and promptly put on a t-shirt over her bathing suit. Other vulgar remarks and behavior along these lines also occurred.

### C. Retaliation Claim

After Shea filed this lawsuit, Galaxie filed a separate suit against Shea and Shea's fiancé's mother, claiming that the mother should have paid in a lump sum, rather than in installments, for work Galaxie had performed on a bathroom in her home. Pinsler, his foreman, and Shea had reached a verbal agreement that Shea would pay for the work in $200 installments. Shea made five such payments, but Galaxie never cashed the checks, and Shea stopped payment on all five checks after she received notice of Galaxie's suit against her. Galaxie also sued Shea for the cost of the cruise, and for repayment of certain loans she had taken out from the company. Shea had treated the cruise as a bonus, and had received an IRS Form 1099 from Galaxie that corroborated her understanding. Her company loans had been paid off by deductions from her weekly paycheck, except for a $1,600 loan that she repaid in cash.

## II

The jury found in Shea's favor, but its damage awards reflected a nuanced view of the case. On her two FLSA claims, it awarded Shea $1,207.50 for lost wages, nothing in compensatory damages for humiliation, inconvenience, and emotional suffering for her complaints about overtime wages, and $9,100 in punitive damages. On the Title VII claim for sexual harassment, the jury awarded Shea $1 for emotional pain, suffering, and humiliation, and $2,500 in punitive damages. After the verdict, Shea moved for liquidated damages under 29 U.S.C. § 216(b), which would have doubled her FLSA lost wages award. The district court refused to grant liquidated damages, but it did grant Shea prejudgment interest on the lost wages award. Galaxie moved first for judgment as a matter of law on the FLSA punitive damages, and second to remit $2,475 of the $2,500 Title VII punitive damages award, arguing that a ratio of 2,500 to 1 was impermissibly high. The district court granted the first motion and reduced the FLSA punitive damages award to zero. It denied the remittitur.

For their part, Shea's lawyers moved under 29 U.S.C. § 216(b) and 42 U.S.C. § 2000e–5(k) for $114,766.50 in attorneys'

fees and $5,694.15 in expenses. The district court slashed the request dramatically. It granted only about one-fifth of the fees ($20,841.50) and less than half of the expenses ($2,642.97). To a minor degree, it based these decisions on specific objections Galaxie had raised to the listed fees and expenses, but the principal reason for its action was the court's belief that the lawyers had achieved only limited success for their client.

### III

We begin with Shea's argument that the district court should have granted liquidated damages on her FLSA claims pursuant to 29 U.S.C. § 216(b), doubling the award she received. That statute makes liquidated damages mandatory unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law. See 29 U.S.C. § 260. The employer bears the burden of proving both good faith and reasonable belief. *Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir.1995). Although in the final analysis we review a district court's decision on liquidated damages for abuse of discretion, that discretion must be exercised consistently with the strong presumption under the statute in favor of doubling. *See id.*; *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986). *Cf. In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir.1997) (district court has some discretion over awards of prejudgment interest, but an award is normally necessary to make the winning party whole). Doubling is the norm, not the exception, *see Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir.1995), as the district court acknowledged.

The district court found that Galaxie had demonstrated good faith, commenting that the company's failure to pay overtime to Shea "resulted from good faith record-keeping errors by defendant's employees. In fact, plaintiff, as office manager of defendant, was the one who paid employees—including herself—overtime wages." *Shea v. Galaxie Lumber & Constr. Co.*, 1997 WL 51655, at *2 (N.D.Ill. Feb. 5, 1997). The court then con-

cluded that viewing Galaxie's conduct as a whole, it appeared that Galaxie reasonably believed it was not violating the FLSA.

Even if we credit the court's finding on good faith, we cannot identify anything in the record that supports its equally necessary finding on the reasonableness of Galaxie's course of action. The district court cited no specific evidence, nor has Galaxie pointed to anything other than the fact that Shea herself was responsible (at least for part of the time) for certain payroll tasks. The latter fact does not let Galaxie off the hook. As the Fifth Circuit put it in *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1263 (5th Cir. 1986), "an employer cannot satisfy its dual burden under § 260 solely by suggesting that lower-level employees are responsible for the violations . . . ." *See also Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C.Cir.1994). *Cf. Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1407–08 (10th Cir.1992) (rejecting indemnity action against employee for failure to comply with FLSA); *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir.1992) (same).

For this purpose, Shea easily qualifies as a lower-level employee. From the time she was hired in June 1992 until Ruzecki's departure in December of that year, Shea was a receptionist who submitted timecards to her superior. Even after Ruzecki's departure, when she assumed more responsibility for managing the office, she never had the authority to sign checks. Even if Galaxie assumed that she was an expert on the FLSA, there is nothing in the record to suggest that such an assumption was reasonable, as the term is used in § 260. *See Thomas*, 39 F.3d at 373. Furthermore, Galaxie did nothing else to ascertain its compliance with the statute, such as consulting its accountant or attorney. We conclude that Galaxie did not meet its burden of establishing its reasonable belief in the legality of its actions. The district court therefore should have doubled Shea's FLSA lost wage award from $1,207.50 to $2,415.00 in accordance with § 216(b).

Galaxie correctly points out that once we order liquidated damages, we must vacate the prejudgment interest award. *See Gibson*

*v. Mohawk Rubber Co.*, 695 F.2d 1093, 1102 (8th Cir.1982). Not all circuits take this view, but most do. *See Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1101–02 (3d Cir.1995) (First, Fourth, Fifth, Sixth, Eighth, and Tenth Circuits follow the *Gibson* approach; Second, Third, Ninth, and Eleventh do not). *See also Fortino v. Quasar Co.*, 950 F.2d 389, 397–98 (7th Cir.1991) (adopting the Gibson approach for the ADEA, and rejecting the reasoning eventually followed in *Starceski*); *Reich v. Sea Sprite Boat Co.*, 64 F.3d 332, 333 (7th Cir.1995) (noting the conflict between *Fortino* and *Starceski*). We see no need to revisit the issue.

▬ Next, we consider Shea's challenge to the district court's decision to vacate the jury's award of $9,100 in punitive damages under the FLSA. We review this decision *de novo*. *Payne v. Milwaukee County*, 146 F.3d 430, 432–33 (7th Cir.1998). As the district court properly recognized, the punitive damages provision of 29 U.S.C. § 216(b) applies to claims under § 215(a)(3) for retaliation for filing an FLSA claim, but punitive damages are not available for claims based on a failure to pay overtime. The problem here arises from two interpretations by the district court-one of the verdict form, and one of § 216(b). For purposes of punitive damages, the verdict form provided to the jury did not distinguish between Shea's lost wages theory and her retaliation theory. The district court interpreted the jury's decision not to award any "compensatory damages for humiliation, inconvenience and emotional suffering sustained for complaining about not receiving overtime" as a signal that the jury had concluded Shea suffered no actual damages on her retaliation claim. Turning to the language of § 216(b) and analogous caselaw, the court then concluded that absent compensatory damages on the retaliation claim, punitive damages on the same claim were unavailable as a matter of law.

Looking at both the verdict form and the instructions to the jury, it is far less clear than the district court thought that the jury's decision not to award compensatories for Shea's "complaining" meant that it had also rejected her retaliation theory. As noted above, the verdict form on its own was not sufficiently specific to make the jury's thinking obvious, and the district court's instructions were, by and large, correct. The instructions to the jury read as a whole (which is the proper way to read them, *see Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir.1995)) make it quite clear that the jury was to consider punitive damages on the "discrimination" (*i.e.*, retaliation) claim. The district court spelled out in separate paragraphs the damages allowable on the overtime wage claim ("the measure of damages on the overtime wage claim is the difference between what [the plaintiff] should have been paid under the Fair Labor Standards Act and the amount that you find [she was] actually paid by the employer") and the retaliation claim ("[a]ny employer who violates the anti-discrimination [*i.e.*, retaliation] provisions of the Fair Labor Standards Act may be liable to the employee for compensatory and punitive damages in an amount to be set by the jury"). Trial Transcript at 793. The court then continued with detailed instructions on the imposition of punitive damages:

> In this case, you have discretion to award punitive damages if you find that defendant acted in deliberate disregard of plaintiff['s] rights. You may award an amount of punitive damages which all jurors agree is proper.
>
> In fixing the amount, you should consider the following questions: How offensive was the conduct? What amount is needed to prevent repetition of violation of the anti-discrimination provision of the Fair Labor Standards Act regarding overtime in light of defendant's financial condition? And has the amount a reasonable relationship to the actual damages awarded?
>
> If you do find—award punitive damages, you should fix the amount used using calm discretion and sound reasoning. You must not be influenced by sympathy for or dislike of any party in the case.

*Id.* at 794–95. While the instructions were not a model of clarity or accuracy in all respects, the district court's second question ("What amount is needed to prevent repeti-

tion of violation of the anti-discrimination provision of the Fair Labor Standards Act regarding overtime in light of defendant's financial condition?") could not have left any doubt in the jury's mind about the sort of wrongdoing that they were empowered to punish. Following our normal presumption that juries understand and abide by the instructions they are given, *see United States v. Madoch*, 149 F.3d 596, 599 (7th Cir.1998); *Jonasson v. Lutheran Child and Family Servs.*, 115 F.3d 436, 439 (7th Cir.1997), this means that the jury must have found retaliation and based its punitive damages award on that finding. It is also noteworthy that Galaxie objected neither to the verdict form nor to the instructions on punitive damages, see Trial Transcript at 782, 806, and so now it must live with them. *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998).

Under § 216(b), punitive damages were available, even though the verdict form showed that the jury had awarded nothing in actual damages on the retaliation claim. The district court reached the opposite conclusion, based on its interpretation of our decision in *Hennessy, supra*, but we think the better reading of *Hennessy* actually supports the possibility of punitive damages. In that case, plaintiff Patricia Hennessy had sued her former employer for sex and pregnancy discrimination in violation of Title VII, as amended by the Civil Rights Act of 1991. 42 U.S.C. § 2000e *et seq.* The jury found liability and, based on its finding that the employer had acted with malice or reckless indifference to her rights, it awarded Hennessy punitive damages. It specifically did not award compensatory damages, but the district court ordered reinstatement and back pay on post-verdict motions. In response to Penril's argument that Hennessy was not entitled to any punitive damages because the jury refused to award her compensatory damages, this court held that "[n]othing in the plain language of [42 U.S.C.] § 1981a conditions an award of punitive damages on an underlying award of compensatory damages," 69 F.3d at 1352, and "the jury's consideration of the issue of punitive damages was appropriate, even

though it did not award compensatory damages." *Id.*

The district court thought that this language was inapplicable to Shea's FLSA case because Hennessy, unlike Shea, was the recipient of punitives (awarded by the jury) and compensatories (back pay awarded by the district judge after the jury verdict) that were based on the same wrong. The district court concluded that this provided a clear link in *Hennessy* between the two damages awards-a link missing in Shea's case. But the mere fact that both the jury and the judge imposed damages for the same wrong in the *Hennessy* case did not create a causal or contingent relationship between the two. The holding in *Hennessy* was not dependent on the district judge's later decision to award equitable relief (in the form of back pay) to the plaintiff there. It was instead an interpretation of the kinds of relief available under § 1981a and how they are related to one another. Under that statute, a jury is entitled to award punitive damages even if it thinks compensatory damages are not justified on the record. The jury's award of punitive damages is not a contingent one, to be implemented if and only if the district court later decides to award back pay. *Hennessy*, 69 F.3d at 1351–52. It is a verdict for damages that should be evaluated only on grounds available for challenging such verdicts.

■ The only question here is whether the interpretation of Title VII in *Hennessy* applies by analogy to the FLSA. The language of the FLSA remedies provision is at least as broad as that found in 42 U.S.C. § 1981a for Title VII claims. Section 216(b) states:

Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

This court has interpreted the words "legal or equitable relief" to include punitive damages under the FLSA. *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d

108, 111 (7th Cir.1990). As we noted before, in this case the jury signed a form saying that it found for Shea and against Galaxie on the FLSA issues (plural), which might have meant that the damages award was supposed to cover both the lost wages and the retaliation claims. But given jury instructions which made clear that punitive damages were only available to punish retaliation, a completed verdict form which does not undermine our presumption that the jury followed those instructions, and the absence of a timely objection to either the instructions or the form, we see no reason not to approve the jury's decision to impose on Galaxie the punitive force of FLSA § 216(b). Consistent with our reading of Title VII in *Hennessy* and more recently in *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir.1998), and with our reading of 42 U.S.C. § 1983 in *Erwin v. Manitowoc County*, 872 F.2d 1292, 1299 (7th Cir.1989), we hold that punitive damages may be awarded on an FLSA § 216(b) retaliation claim even without a separate award of compensatory damages. Shea is therefore entitled to have her $9,100 FLSA punitive damages verdict reinstated.

 On its cross-appeal, Galaxie argues that the district court abused its discretion when it refused to reduce the other punitive damages that the jury imposed—the $2,500 award based on Shea's Title VII claim. Galaxie makes the irrefutable mathematical point that $2,500 is 2,500 times greater than $1, which is the amount the jury gave to Shea as actual damages on that claim. The Supreme Court, however, has never held that simple mathematical ratios are the be-all and end-all in punitive damages analysis, and nothing in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), would support such a rule. Indeed, in *BMW* the Court noted that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. 1589. This jury obviously thought that Shea had not suffered tangible damages, or even compensable emotional damages, from the sexual harassment she endured, but it found the company's conduct reprehensible to the tune of $2,500. Viewing that amount as a

component of the overall verdict, we cannot say that it is grossly out of line. *Cf. id.* at 576, 116 S.Ct. 1589. That in turn makes it impossible for us to find that the district court abused its discretion by refusing to grant Galaxie's requested remittitur, especially after *Timm*, 137 F.3d at 1008–09, in which we affirmed $15,000 in punitives for a Title VII sexual harassment plaintiff who had received no compensatory award at all.

Last, Shea's attorneys are unhappy with the district court's decision to slash their fees to only about 20% of what they requested. In general, as we have had occasion to note recently, the district courts both can and should look to the degree of success a party achieves in deciding how generous a fee award should be. *See Jaffee v. Redmond*, 142 F.3d 409, 413–14 (7th Cir.1998) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). *See also Farrar v. Hobby*, 506 U.S. 103, 114–15, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In light of our rulings on Shea's entitlement to liquidated damages on her lost wages claim and to her FLSA punitive damages award, both of which leave Shea in a stronger position as a prevailing party, we vacate the decision on attorneys' fees and costs and remand that part of the case for further proceedings.

The judgment of the district court is RE-VERSED and the case is REMANDED for further proceedings consistent with this opinion. We award Shea her costs on this appeal.