Anthony MARTIN and Herbert
Armitage, Plaintiffs,

v.

INDIANA MICHIGAN POWER
COMPANY, d/b/a American
Electric Power, Defendant.

No. 00–CV–218.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 30, 2002.

Ellen S. Carmody, Stephen D. Turner, Law, Weathers & Richardson, Grand Rapids, MI, for plaintiffs.

Peter A. Smit, Joseph J. Vogan, Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Senior District Judge.

Plaintiff Herbert Armitage filed this action against his employer, Indiana Michigan Power Company, d/b/a American Electric Power ("AEP"), alleging violations of the overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* On January 9, 2002, the court issued an order granting summary judgment in Mr. Armitage's favor on the issue of AEP's liability for violation of the FLSA.

The issue of damages was tried before the court sitting without a jury over a two-day period beginning on February 6, 2002 and concluding on February 20, 2002.[1] The case is ripe for decision.

## FINDINGS OF FACT

1. Plaintiff Herbert Armitage is 42 years old. He earned an Associate's Degree in electrical engineering technology, with an emphasis in calculus and physics, from Michigan Technological University. Plaintiff has worked for AEP for approximately 20 years. His current position is that of "IT (Information Technology) Support Specialist I" at AEP's Donald C. Cook Nuclear Plant (the "plant" or the "Cook plant") located in Bridgman, Michigan. The Cook plant is a nuclear powered generating station providing power to customers in Michigan, Indiana, and other locations.

2. Before November 1, 1998, plaintiff held the position of "Computer/Security/Standards/Technician—Senior," a position classified by AEP as nonexempt for purposes of FLSA overtime pay requirements. However, as of November 1, 1998, when AEP gave plaintiff his current title of IT Support Specialist I, AEP reclassified plaintiff as an exempt employee.

3. Plaintiff's November 1, 1998 reclassification and change in job title were not accompanied by a substantial change in his duties. Both before and after AEP's reclassification of plaintiff's position, plaintiff's duties primarily consisted of maintaining and repairing security equipment both within and around the perimeter of

---

1. Mr. Armitage was joined as a plaintiff in this action by another AEP employee, Anthony Martin. However, the court's January 9, 2002 order which granted summary judgment on the issue of liability in favor of Mr. Armitage also granted summary judgment in favor of AEP on Mr. Martin's claim, on the basis that Mr. Martin was exempt from the overtime requirements of the FLSA as a matter of law. Therefore, this action was tried on the issue of damages only as to Mr. Armitage, and all references to "plaintiff" are intended solely as references to Mr. Armitage.

the Cook plant. In plaintiff's words, "I fixed things" associated with the plant's security system. The equipment for which plaintiff was responsible included such items as security fence alarms, security cameras, and security card readers. Plaintiff's duties, which regularly required the use of tools, were largely manual in nature. In a June, 1999 performance assessment, plaintiff's then-supervisor, Sam Reid, described plaintiff as "the most knowledgable [sic] person onsite about security hardware." In an August, 2000 performance assessment, Reid's successor also described plaintiff as "the most knowledgeable person on the Cook plant security system hardware."

4. Since November 1, 1998, plaintiff has on occasion worked in excess of 40 hours during individual workweeks. However, because AEP classified him as an exempt employee, AEP did not pay plaintiff one and one-half times his regular hourly rate for each hour of overtime. Instead, AEP paid plaintiff for overtime hours at his regular hourly rate pursuant to the company's exempt overtime plan.

5. AEP's reclassification of plaintiff's position, which was accompanied by a change in his job title, was part of a restructuring of AEP's IT department undertaken at the company's headquarters in Columbus, Ohio. This restructuring, known as the "IT Retention Project," had as its goal to provide up-to-date position descriptions and to match employees to those updated descriptions.

6. A team consisting of four individuals was responsible for AEP's IT Retention Project. This four-member team included two senior IT analysts and two Human Resources specialists. Only the two Human Resources specialists had experience in dealing with FLSA issues.

7. The IT Retention Project team went through a number of steps in completing the project's goals. These included (1) creating a chart of IT "job families" consisting of various IT positions and levels within each position; (2) creating an IT "skills matrix" defining the duties of each position; and (3) "grading" the various IT positions, which included both (a) determining whether a position was exempt or nonexempt for purposes of the FLSA and (b) determining the level of compensation.

8. As part of the "grading" process, the team made a determination of exempt status which applied to entire job "families"; in other words, if a particular position fell within a job family, and that family was determined to be exempt, then the position was considered to be an FLSA exempt position. In determining whether a particular job family was exempt, the IT Retention Project team considered such factors as the duties of a position; the level of responsibility and supervision required; and the level of education and experience required.

9. As a result of this restructuring process, only one IT job family was determined to be exempt: that of "IT Technician."

10. It was only after this initial process was complete—the process of establishing new job families, job titles, and job definitions—that AEP began the process of matching employees to particular jobs on the job family chart. According to AEP, the company's plan was to conduct a series of employee meetings led by "career coaches," during which each employee would be provided with copies of the job family chart, the skills matrix, instructions, a "question and answer" sheet, and an "individual mapping sheet." During these meetings, employees were also to be shown a video designed to help them complete their individual mapping sheets. The instructions for completing the mapping sheets instructed employees to return their individual mapping sheets to the

company's Columbus headquarters by October 22, 1998.

11. Before being reclassified, plaintiff attended one of these meetings held at the Cook plant in October, 1998. Although there were career coaches present at the meeting, plaintiff did not individually meet with a career coach at that time. (According to plaintiff's credible testimony, he did not meet with a career coach until much later, after he had already been reclassified.) Also present at the meeting was Robert Smith, who, as Manager of the IT department, was the supervisor of plaintiff's then-immediate supervisor, Sam Reid. At the meeting, Smith announced that all IT employees would be classified as exempt.

12. A few days after this meeting, which plaintiff attended, plaintiff was paged by Reid. Upon reporting to Reid's office, plaintiff was instructed by Reid to complete his individual mapping sheet. Plaintiff completed portions of the mapping sheet himself, which included describing his "Assignments/Responsibilities" as

Design, install, maintain, verify compliance of all hardware associated with security system, coordinate with all departments to ensure efficient & smooth removal & reinstallation of system components.

Additional portions of the mapping were completed by plaintiff, however, based on Reid's instructions. For instance, for "Selected Job Family," plaintiff, at Reid's direction, listed "IT Support." Beneath this, plaintiff was instructed to place a job level within the IT Support job family which best described his job functions in seven different areas, including "Managerial/Technical Profiency," "Problem Solving and Initiative," "Education/Experience," "Planning and Organization," "Personal Effectiveness," "Decision Making and Business Awareness," and "Leadership and Guidance." In these job function categories, plaintiff recorded either "Specialist I" or "Senior" as the appropriate job level. In five of the seven categories, plaintiff listed "Specialist I." Therefore, where the mapping sheet required him to identify a "Selected Job Level," plaintiff, once again acting on Reid's instructions, put "Specialist I." Plaintiff then signed the mapping sheet. The evidence shows that plaintiff's individual mapping sheet was signed with a date of October 19, 1998.

13. Plaintiff was not aware when he completed the mapping sheet that identifying himself as part of the IT Support job family would cause him to be deemed by AEP to be exempt for FLSA purposes. Plaintiff discovered that he had been transformed into an exempt employee on November 3, 1998, when he attempted to prepare a computerized timesheet using his former non-exempt codes, which he realized no longer worked.

14. Although Reid has denied instructing plaintiff on how to complete the mapping sheet and denies specifically instructing plaintiff to identify himself as part of the IT Support job family, his testimony nonetheless essentially supports plaintiff's. For instance, Reid testified that plaintiff originally believed that none of the jobs identified on AEP's IT matrix applied to him. Reid also testified that he planned on giving plaintiff additional training and responsibilities with computers. (Plaintiff's duties at the time did not involve the installation or repair of computers, although the plant's computers interacted with security equipment for which plaintiff did have responsibility.) Reid also testified that he believed that classifying plaintiff as an exempt employee was better for plaintiff's long-term career, insofar as it provided him with more opportunities within the company. This is consistent with plaintiff's own testimony, to the extent that plaintiff testified that he told

Reid, after they had completed the mapping sheet, "now I have a career." The court finds that plaintiff would not have completed the mapping sheet in the manner in which he did without Reid's direct input and instructions. Unfortunately, however, Reid's instructions and input were based primarily not on plaintiff's actual duties at the time, but on Reid's future plans for plaintiff. Although Reid did not subjectively harbor any intent to harm plaintiff either personally or professionally by identifying him as part of the exempt IT Support job family, Reid in fact caused plaintiff to submit a mapping sheet which did not fully and accurately reflect the realities of plaintiff's position.

15. AEP's IT department, as restructured, consisted of eight different job families: IT Leadership, IT Training, IT Architecture, IT Software Development, IT Support, IT System Administration, IT Business Administration, and Information Technician. Of these job families, only Information Technician was classified by AEP as exempt. However, curiously, after the restructuring no employees were classified as Information Technicians. The existence of this exempt job family which included no employees is odd, and provides support for plaintiff's testimony that Smith had announced that all IT employees would be classified as exempt.

16. As a result of his November 1, 1998 reclassification, plaintiff received a pay raise, which Reid indicated was to compensate plaintiff for his loss of additional overtime. Before his reclassification, plaintiff was paid $ 25.74 per hour. After his reclassification, plaintiff was paid a salary of $ 58,300 per year, in addition to "straight time" for overtime in excess of 40 hours per week. As the court has found above,

however, plaintiff's duties did not substantially change at the time of his reclassification.

17. Eventually, plaintiff's manual duties were largely reassigned to fall within the plant's Maintenance Department. At this point, plaintiff's duties did in fact change. However, this did not occur until sometime during the year 2001, long after AEP's November 1, 1998 reclassification of plaintiff to exempt status.

18. AEP did not have reasonable grounds for believing that its reclassification of plaintiff as an exempt employee was not a violation of the FLSA.

19. Based upon the court's previous ruling regarding the proper methodology for calculating damages,[2] the parties are in agreement that the amount of plaintiff's unpaid overtime compensation is $ 9,879.58. (Plaintiff Armitage's Proposed Findings of Fact and Conclusions of Law at 4, ¶ 19; Defendant's Opening Statement).

20. In December, 2001, after plaintiff had filed this action, AEP gave plaintiff a check, the net amount of which was $10,000. A letter which accompanied the check indicated that AEP intended the payment to encompass any unpaid overtime which was due plaintiff. Plaintiff accepted and cashed the check.

## CONCLUSIONS OF LAW

A. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 insofar as plaintiff's claim is brought under the civil enforcement provision of the FLSA, 29 U.S.C. § 216(b).

B. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

---

2. On January 29, 2002, the court issued an order in which it concluded that plaintiff need only be paid FLSA damages based on hours actually worked in excess of 40 per week. *The court ruled that this conclusion would control in the court's resolution of the issue of liquidated damages.*

■ C. Section 207(a)(1) of Title 29 makes it unlawful for a covered employer to employ an individual "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess [of 40 hours] at a rate not less than one and one-half times the regular rate at which he is employed." In addition, section 216(b) of Title 29 specifies that "[a]ny employer who violates the provisions of [section 207] of this title shall be liable to the employee or employees affected in the amount of their unpaid ... overtime compensation ... and in an additional equal amount as liquidated damages." Section 216(b)'s provision for liquidated damages is "compensatory, not punitive in nature," intended "to compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir.1991) (citation omitted), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992).

D. Despite the "mandatory language" of 29 U.S.C. § 216(b) with respect to liquidated damages, "Congress has provided courts with some discretion to limit or not award liquidated damages." *Martin,* 940 F.2d at 907. Specifically, 29 U.S.C. § 260 provides in pertinent part as follows:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

■ E. "Double damages are the norm, single damages the exception," and the burden is on the employer to overcome what is in effect a presumption that the

full amount of liquidated damages will be awarded. *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir. 1986). The employer's burden is a substantial one. *Elwell v. University Hospitals Home Care Services,* 276 F.3d 832, 840 (6th Cir.2002). Before a court may exercise its "sound discretion" to deny or limit liquidated damages, the employer "must show good faith and reasonable grounds" that it would be unfair to impose more than a compensatory verdict. *Martin,* 940 F.2d at 907 (citations omitted). This is a two-fold requirement:

> The good faith requirement is a subjective one that 'requires that the employer have an honest intention to ascertain and follow the dictates of the Act.' The reasonableness requirement imposes an objective standard by which to judge the employer's conduct.

*Williams v. Tri–County Growers, Inc.,* 747 F.2d 121, 129 (3d Cir.1984) (citations omitted); *see also Bratt v. County of Los Angeles,* 912 F.2d 1066, 1071 (9th Cir.1990) ("The statutory requirement of good faith and reasonable grounds establishes a test with both subjective and objective components"), *cert. denied,* 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991). Before a court exercises its discretion, it must make findings both that the employer acted in good faith, and that it acted with reasonable grounds. *Elwell,* 276 F.3d at 840; *Martin,* 940 F.2d at 907; *Williams,* 747 F.2d at 129. "If the employer fails to satisfy both requirements, the court lacks discretion to deny liquidated damages." *Williams,* 747 F.2d at 129; *see Shea v. Galaxie Lumber & Const. Co. Ltd.,* 152 F.3d 729, 733 (7th Cir.1998) (statute "makes liquidated damages mandatory unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law"). To carry its burden of demonstrating good

faith, "a defendant employer must show that [it] took affirmative steps to ascertain the Act's requirements[.]" *Martin*, 940 F.2d at 908. However, even where the employer satisfies its burden of showing good faith and reasonable grounds, "the District Court nevertheless may award full liquidated damages equal to, and in addition to, the unpaid back wages." *McClanahan v. Mathews*, 440 F.2d 320, 323 (6th Cir.1971); *see York v. City of Wichita Falls, Texas*, 763 F.Supp. 876, 883 (N.D.Tex.1990) ("Congress has authorized courts to award up to the full sum of liquidated damages notwithstanding an employer's demonstration of good faith and objective reasonableness").

F. AEP attempts to satisfy its burden by showing that it followed a "careful process" in reclassifying plaintiff as an exempt employee. AEP contends that the fundamental purpose of the IT Retention project was to make sure that the company's IT positions were properly classified and paid. In addition, AEP argues, although plaintiff became an exempt employee as a result of this process, his pay was actually increased at the time of his reclassification, thus negating any suggestion that the company was motivated by an attempt to reduce its labor costs. AEP further argues that the question of whether plaintiff's duties qualified him as exempt or non-exempt was a "close" one. AEP emphasizes that the only requirement of the administrative exemption that plaintiff failed to satisfy was the provision requiring his primary duties to consist of "office or non-manual work." AEP argues that although it had intended for plaintiff's duties to change, for various reasons, including an outage and plaintiff's own preferences, this never happened (or, it did not happen until much later, during the pendency of this action).

G. The FLSA exempts from its overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a). With respect to the "administrative" exemption, the Department of Labor's "short test" defines an employee employed in a bona fide administrative capacity as any employee whose "primary duty" consists of "the performance of office or non-manual work directly related to management policies or general business operations of his employer[,]" and who "customarily and regularly exercises discretion and independent judgment[.]" 29 C.F.R. § 541.2(a), (b); *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 684 (6th Cir.2001).

The court has already concluded in its summary judgment ruling that plaintiff is non-exempt as a matter of law, based on his performance of primarily manual duties during the relevant time period. The issue was not a "close" one, as AEP has contended in its arguments to the court during the liquidated damages phase of this case. Notably, AEP conceded, in moving for summary judgment based on a "good faith" defense, that its own expert had concluded that the administrative exemption did not apply to Armitage because he continued to perform manual duties after his reclassification. Brief in Support of Defendant's Motion for Summary Judgment and Partial Summary Judgment, at 17. (AEP also characterized as "inconclusive" the evidence regarding whether Armitage's duties qualified him as an exempt professional, *id.*, a position which it seems to have abandoned altogether by the time of trial.)

Armitage's principal duties during the relevant time period consisted of the installation, maintenance, and repair of the plant's security equipment. There is no doubt that these duties were primarily manual in nature. Quite simply, plaintiff's duties rendered him utterly unable to sat-

isfy a critical requirement for exempt status.

The court is not saying that AEP, like the employer in *Martin*, "did not do any analysis or conduct any inquiry to determine whether [the plaintiff] qualified for an exemption." 940 F.2d at 909. The court believes that AEP's subjective intentions in undertaking to restructure the IT department were honest and that it generally intended to follow the requirements of the FLSA. However, it is in addressing the objective reasonableness requirement that AEP's proofs fall short, in the court's view. A number of considerations cause the court to reach this conclusion.

One concern is the manner in which the IT job family matrix was created. Supposedly, the IT Retention team considered employee input in creating the matrix. If so, one could logically expect that one end result of the restructuring process would be that at least one or more employees would be classified in each job family. However, this was not what happened. Ultimately, no employee was classified as a non-exempt Information Technician. This empty category should have alerted the IT Retention team that something was either fundamentally wrong with the matrix, or, alternatively, that something had gone wrong during the mapping process.

This leads the court to another concern. While certain members of the IT Retention team apparently had some familiarity with the FLSA, these were not the persons who participated on a direct level with employees completing the mapping process. Instead, AEP allowed plant management—individuals such as Smith and Reid—to assist employees in determining how they would be classified. However, there is no showing that these individuals (Reid, in particular, who directed plaintiff in completing his mapping sheet) were familiar with the correct standards for determining whether an employee was exempt.

Therefore, as ultimately executed, the process was blind, and therefore flawed for purposes of the FLSA. An employer cannot assign the making of decisions on exempt status to supervisors or other personnel who have little or no familiarity with the statute's requirements and then claim to have "reasonable grounds" for believing that it is not violating the FLSA. While Reid, as plaintiff's supervisor, should have been aware of what duties plaintiff was performing, he knew little about the FLSA.

■ In addition, Reid *was* aware of what duties plaintiff was performing; he knew that they were primarily manual, though he planned for that to change. The plans to change plaintiff's duties formed the basis for Reid's instructions to plaintiff for completion of the latter portion of plaintiff's mapping sheet. However, "the reasonable basis inquiry mandates taking a snapshot of [plaintiff's] duties at the time of reclassification[.]" *Rainey v. American Forest and Paper Ass'n, Inc.*, 26 F.Supp.2d 82, 99 (D.D.C.1998). A determination of exempt status cannot be made based on plans for the employee's future.

■ AEP appears to suggest that the court should not look to Reid's actions; according to AEP, "Reid is not a defendant in this case[,]" and "the appropriate inquiry is what policies and procedures did the company put into place to make sure that the persons in Columbus were receiving accurate information." Because company headquarters took steps to comply with the FLSA, AEP argues, the company "should not be required to pay a penalty." However, the damages which 29 U.S.C. § 216(b) makes available to a plaintiff are "liquidated damages," not punitive damages. It is well established that liquidated damages under this provision "are compensation, not a penalty or punishment."

*Elwell,* 276 F.3d at 840; *see Martin,* 940 F.2d at 907 (liquidated damages are "compensatory, not punitive in nature"). In this regard, AEP's citation to *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 2129, 144 L.Ed.2d 494 (1999), a case addressing punitive damages under Title VII, is not apropos. "The 'reasonable grounds' portion of 29 U.S.C. § 260 does not call upon the court to evaluate who in the employer's chain of command committed the 'act or omission.' " *Thomas v. Howard University Hosp.,* 39 F.3d 370, 373 (D.C.Cir.1994).

AEP also misses the mark in suggesting that plaintiff's cooperation with Reid in completing the latter portion of the mapping sheet amounted to some sort of misrepresentation which renders the company's reclassification of him as exempt objectively reasonable. AEP goes so far as to argue that the court should consider "whether the employer has relied on any affirmative representations by the employee." As noted above, Reid was aware of what plaintiff's duties were; plaintiff did not misrepresent anything to him. The evidence shows that Reid told plaintiff that it would be better for his career to be part of the IT Support job family than part of the IT Information Technician family, and although plaintiff did not really believe that he fit well in either category, AEP's matrix and instructions for completing the mapping sheet effectively gave him no other choice. The court recognizes that AEP had no apparent motive to mis-classify plaintiff; all employees were instructed that their pay would not be reduced as a result of reclassification, and plaintiff's pay in fact increased. However, while this fact is supportive of AEP's subjective good faith, it does not show that AEP's classification of plaintiff was objectively reasonable.[3]

Finally, even assuming that the fundamental purpose of the IT Retention project was to make sure that the company's IT positions were properly classified and paid, and determining whether positions were exempt or non-exempt was part of this process, the exempt/non-exempt determination appears to have been little more than a secondary part of the restructuring process. Although members of the IT Retention team may have had some familiarity with the requirements of the FLSA, AEP has failed to show that any of these persons specifically reviewed the relevant Department of Labor regulations in reclassifying plaintiff. Likewise, AEP has not shown that it consulted with an attorney or otherwise sought legal counsel to determine whether plaintiff's reclassification from exempt to non-exempt was appropriate. While this is certainly not required in every case, here it is simply one additional manner in which AEP's proofs fall short in establishing that its actions were objectively reasonable.

H. Before trial, plaintiff filed a motion in limine seeking, among other things, to preclude testimony by one of AEP's proposed expert witnesses, Dale Anderson. During the trial, plaintiff also objected to both deposition testimony and a written report prepared by Anderson, offered by AEP. The court indicated that it would resolve these objections in issuing its ruling on the case.

Plaintiff's objections to Anderson cover both the nature of her qualifications

---

**3.** In addition, it is worthwhile to note that, like AEP, plaintiff had no apparent financial motive to misrepresent his duties, for he had no reason to believe, based on what he was told, that his pay would be reduced. AEP itself concedes that the information provided to employees during the mapping process did not include salary information. Therefore, plaintiff's only apparent motive for completing the mapping sheet as he did was to please his supervisor.

and the nature of her opinions. Plaintiff has argued that Anderson has insufficient expertise to offer opinions on issues related to the FLSA; that her opinions are legal opinions; and that her opinions will not assist the trier of fact to determine any facts in issue.[4]

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue[.]" Fed.R.Evid. 702. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994). "To determine whether a witness is qualified to render an expert opinion, the court must first ascertain whether the proffered expert has the educational background or training in a relevant field." *TC Sys., Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 174 (N.D.N.Y.2002). "Then the court 'should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit] the expert . . . to testify only if the expert's particular expertise . . . enables the expert to give an opinion that is capable of assisting the trier of fact.'" *Id.* (citations omitted). "[L]ack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying." *Id.* (citation omitted).

Dale Anderson earned a BA from the University of California Davis. Currently employed as an "independent consultant," she has over 23 years of experience in the area of human resources management, including 19 years in the utility industry, seven of which were exclusively in nuclear power generation. She is offered as an expert in the area of compensation and job evaluation, and has been asked to render opinions on the accuracy of plaintiff's job description and whether AEP made a reasonable and good faith determination on plaintiff's exempt status. While Ms. Anderson has both taken courses in and had practical experience in FLSA exemptions, she is not, but need not be, an expert in the narrow field of FLSA exemptions in order to offer an expert opinion in this case. The court finds that Ms. Anderson's knowledge and experience render her sufficiently qualified as an expert to offer her opinions on the particular subjects of plaintiff's job description and AEP's determination on plaintiff's exempt status.

Having determined that Ms. Anderson is qualified to testify as an expert, the court's next inquiry is whether her proposed testimony will assist the court, as the trier of fact, to understand the evidence or determine a fact in issue. Ms. Anderson concludes (1) that plaintiff's IT Support Specialist job description did not reflect the actual duties performed by the plaintiff, but that nonetheless, (2) AEP made a reasonable and good faith effort to ensure that all of its employees were properly classified, based on its use of an "ex-

---

4. Plaintiff has also argued that the written report Anderson prepared is hearsay. Technically, plaintiff is correct. Fed.R.Evid. 702 "permits the admission of expert opinion *testimony* not opinions contained in documents prepared out of court." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir.1994). Although AEP has argued that Anderson was subject to cross-examination, AEP has not suggested how that fact in itself makes her written report admissible in its entirety. *Cf. id.* at 730 (district court did not abuse its discretion in admitting expert's report for rehabilitative purposes).

tensive" and "detailed" classification process. (Ultimately, Ms. Anderson's written report concludes—and this is no surprise—that while AEP "made a reasonable and good faith determination to transition the plaintiff to an exempt position," "circumstances and the timing of the plant shutdown" prevented this from happening.)

Plaintiff's argument that Ms. Anderson's opinions on the reasonableness of AEP's conduct are inadmissible because they are legal in nature are unfounded. Ms. Anderson is essentially opining regarding the sufficiency of the process AEP followed. Moreover, as Fed.R.Evid. 704(a) provides, an expert opinion otherwise admissible is not objectionable because it embraces an "ultimate issue" for the trier of fact. In addition, here, where the court is acting as the trier of fact, the dangers which can be presented by such "ultimate issue" testimony are minimal if not nonexistent.

However, if the dangers of Ms. Anderson's testimony on the issue of reasonableness are minimal, so is her helpfulness to the court in understanding the evidence and determining facts in issue in this case. Ms. Anderson opines that plaintiff's job description was not accurate; however, that determination could, and has already been made earlier in the case. In addition, Ms. Anderson opines that AEP reasonably and in good faith determined to "transition the plaintiff to an exempt position" but simply failed to meet this "goal." However, as noted above, the company's future plans for plaintiff were irrelevant to determining his status.

The only aspect of Ms. Anderson's opinion which is arguably helpful is her conclusion that AEP undertook a detailed classification process. However, the court gives this opinion little weight in reaching its conclusions. It is apparent that Ms. Anderson was not aware of how AEP determined whether any employee—plaintiff in particular—was exempt or nonexempt. In addition, her testimony highlights that while the "paper" classification process might have been detailed, personalization of the process was minimal: for while Anderson testified that she would typically "walk down" a job as a part of her evaluation of the position, no one from AEP's IT Retention team bothered to do so before reclassifying plaintiff. In conclusion, while the court has given some consideration to Anderson's testimony, the court has not found it to be particularly helpful to AEP; instead, the court has found it to be in some respects more favorable to plaintiff.

■■■ I. The parties disagree on the effect of plaintiff's cashing of the $10,000 check from AEP in December, 2001. AEP characterizes its tender of the payment as "corrective action," taken before the court granted summary judgment in January, 2002 concluding as a matter of law that plaintiff was not an exempt employee. Plaintiff, in contrast, argues that the payment should be deemed a "bonus." He argues that AEP made this payment at its own risk and that the court should not allow the company an offset for the amount of the payment. Neither party is correct in its assertions regarding the effect of the payment.

■■■ Notwithstanding his acceptance of the payment, plaintiff characterizes the payment as an improper attempt by AEP to unilaterally settle his claims. Certainly, " '[e]mployers and employees may not, in general, make agreements to pay and receive less pay than the statute provides for. Such agreements are against public policy and unenforceable.' " *Roman v. Maietta Constr., Inc.*, 147 F.3d 71, 76 (1st Cir.1998) (citations omitted). "With only two exceptions, employees cannot waive FLSA claims for unpaid wages or overtime, for less than full statutory

damages." *Manning v. New York University*, No. 98 CIV 3300(NRB), 2001 WL 963982, at *11 (S.D.N.Y. Aug. 22, 2001). These two exceptions include only (1) settlements supervised by the Secretary of Labor, and (2) judicially-approved stipulated settlements. *Id.; see Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–1352 (11th Cir.1982). Neither of these situations is present here. AEP's voluntary payment to plaintiff does not present an issue of settlement or waiver, and plaintiff is simply mistaken in his belief that AEP is trying to pass off the payment as a settlement.

In actions under the FLSA, although a plaintiff is entitled to be made whole, he is not entitled to a windfall at the defendant's expense. *Roman*, 147 F.3d at 77. Section 216(b) provides that the employee is entitled to receive, as a remedy, *"unpaid* overtime compensation" and "an additional equal amount as liquidated damages." Where an employer makes payments to an employee toward overtime hours, the employer remains responsible only for the unpaid portion. *Roman*, 147 F.3d at 77. In addition, where an employer pays an employee for time not otherwise compensable under the FLSA, the employer is entitled to an offset for compensation due under the statute. *Barefield v. Village of Winnetka*, 81 F.3d 704, 710 (7th Cir.1996). This is because the statute "sets a floor, not a ceiling, on compensation that employees must receive." *Id.* at 711. Therefore, the court concludes that AEP is entitled to offset, from the judgment, the amount which it already paid plaintiff. *See Barker v. Billo*, 1984 WL 3171, 6 Wage & Hour Cas. (BNA) 1261 (E.D.Wis.1984) (in view of employee's acceptance of check, amount of check would be deducted from any recovery employee received as a result of § 207 claims).

If plaintiff is wrong in suggesting that the $10,000 payment is meaningless, AEP is also wrong if it thinks that the payment suffices to negate its liability for liquidated damages. The amount of plaintiff's unpaid overtime compensation is $ 9,879.58. It seems that AEP would have the court adopt the view that because it paid plaintiff in excess of this amount ($ 10,000) in December 2001, 21 months after plaintiff filed the action and virtually on the eve of trial (which was previously scheduled to begin on January 15, 2002), then *no* liquidated damages are due because the overtime did not remain unpaid at the time of trial.

What AEP cannot do, however, is effectively nullify plaintiff's entitlement to liquidated damages simply by tendering a check on the eve of trial which covers the full amount of overtime compensation already long overdue. Section 16(b) of the FLSA, 29 U.S.C. § 216(b), "provides absolutely that the employer shall be liable for liquidated damages in an amount equal to minimum wages overdue; liability is not conditioned on default at the time suit is begun." *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 711, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); *see* 29 C.F.R. § 790.22 ("Under this provision of the law, the courts have held that the liability of an employer for liquidated damages in an amount equal to his underpayments of required wages become fixed [sic] at the time he fails to pay such wages when due[.]"). Section 16(b) "authorizes the recovery of liquidated damages as compensation for delay in payment of sums due under the Act." *O'Neil*, 324 U.S. at 715, 65 S.Ct. 895. Although *O'Neil* was decided in 1945, two years before the statute was amended in 1947 to permit the court, in its discretion, to reduce the amount of liquidated damages where certain conditions are met, 29 U.S.C. § 260, nothing in these conditions has anything to do with permit-

ting the employer to escape liability for liquidated damages by paying overtime compensation which is already overdue.

■ J. The court concludes that AEP has not shown that it had reasonable grounds to believe that its classification of plaintiff as exempt, and that its consequential payment of overtime at less than the statutorily prescribed rate, did not violate the FLSA. Therefore, the court concludes that plaintiff is entitled to liquidated damages in the amount of $ 9,879.58, which represents an amount equal to the overtime compensation unlawfully withheld. The total due to plaintiff being $ 19,759.16, of which $ 10,000 has already been paid, plaintiff is entitled to entry of judgment against AEP in the amount of $ 9,759.16.

■ K. Plaintiff seeks an award of attorney fees. Section 16(b) of the FLSA, 29 U.S.C. § 216(b), provides that the court, in an action filed under the statute, "shall, in addition to any judgment awarded to the plaintiff ... allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." "The purpose of the FLSA attorney fees provision is 'to insure effective access to the judicial process by providing attorney fees for prevailing plaintiffs with wage and hour grievances.' " *Fegley v. Higgins,* 19 F.3d 1126, 1134 (6th Cir.) (quoting *United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G & M Roofing and Sheet Metal Co.,* 732 F.2d 495, 502 (6th Cir.1984)), *cert. denied,* 513 U.S. 875, 115 S.Ct. 203, 130 L.Ed.2d 134 (1994). "An award of attorney fees to a prevailing plaintiff under § 16(b) of the FLSA is mandatory, but the amount of the award is within the discretion of the judge." *Fegley,* 19 F.3d at 1134 (citation omitted).

■ "Since the FLSA does not discuss what constitutes a reasonable fee, '[t]he determination of a reasonable fee must be reached through an evaluation of a myriad of factors, all within the knowledge of the trial court, examined in light of the congressional policy underlying the substantive portions of the statute providing for the award of fees.' " *Id.* (quoting *United Slate, Tile & Composition Roofers,* 732 F.2d at 501). The FLSA fee-shifting statute contains wording similar to that of many other federal fee-shifting statutes, and Supreme Court has held that its case law construing what is a "reasonable" fee "applies uniformly to all of them." *City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992).

L. The court concludes that plaintiff is as a matter of law entitled to an award of his reasonable attorney fees for maintaining this action.

M. The court also concludes that plaintiff, as a prevailing party against AEP, is entitled to an award of costs pursuant to Fed.R.Civ.P. 54(d)(1).[5]

### *CONCLUSION*

Based on the foregoing, the court orders as follows:

1. A judgment for overtime compensation will be entered in favor of the plaintiff Herbert Armitage and against defendant AEP in the amount of $ 9,759.16.

2. The parties shall consult with one another in an effort to reach a consensual resolution of the amount of attorney fees to which plaintiff is entitled. If a consensus is not forthcoming, plaintiff shall file and serve a written application for attor-

---

5. Pursuant to the court's October 3, 2002 Order on Plaintiffs' Motion to Disallow Claimed Costs and Fed.R.Civ.P. 54(b) Certification, the court will simultaneously address all cost issues, including those involving AEP's Bill of Costs against plaintiff Anthony Martin.

ney fees, together with any supporting evidentiary material and a memorandum of law, within 30 days of his receipt of a copy of these Findings of Fact and Conclusions of Law. Should defendant wish to respond in writing to any such application made by plaintiff, defendant shall do so in writing filed and served not later than 14 days after service of plaintiff's application. The parties are hereby advised, however, that motions for reconsideration of these Findings of Fact and Conclusions of Law will not be favored and, if filed, will not alter the deadlines prescribed in this paragraph.

### *JUDGMENT*

The claim of plaintiff Herbert Armitage in this action came to trial before the court. The issues raised by plaintiff Armitage's claim have been tried, and a decision has been rendered on all matters with the exception of attorneys' fees.

IT IS ORDERED, DECLARED, and ADJUDGED in accordance with the Findings of Fact and Conclusions of Law entered this same date, that plaintiff Herbert Armitage shall recover of the defendant American Electric Power the sum of $ 9,759.16.